(No. 13926.—Reversed and remanded.)

EDWIN M. CLARK, Appellee, *vs.* JAMES B. MUIR, Appellant.

*Opinion filed June 22, 1921—Rehearing denied October 7, 1921.*

1. CONTRACTS—*when a contract must be construed in light of circumstances at time it was made—extrinsic evidence.* Where a party has purchased property with his own money, an agreement which he subsequently signs with the real estate agent who negotiated the sale of the property to him and which recites that the property was purchased for the joint benefit and account of the agent and the purchaser must be construed in the light of the circumstances existing at the time it was made, together with the subsequent conduct of the parties in relation to the property, and extrinsic evidence is competent in determining what was meant by the agreement.

2. SAME—*real estate agent who has contracted to negotiate a sale must do so within a reasonable time.* Where a real estate agent contracts to negotiate a sale of certain property and no time is agreed upon within which sale is to be made, the law requires it to be made within a reasonable time according to the nature of the thing to be done, and it signifies nothing that the owner does not insist on the sale being made "right away."

3. ACCOUNTING—*when real estate agent is not entitled to an accounting of rents and profits.* Where a party purchases property with his own money, an agreement which he afterwards signs with the real estate agent who negotiated the sale of the property to him and which recites that the property was purchased for the joint benefit of the agent and the purchaser will not entitle the agent to an accounting of rents and profits after the purchaser has been re-paid therefrom and will give him no title to any interest in the property, where the circumstances show the agreement was merely a contract by the agent to manage the sale of the property for a share in the profits when a sale should be made. (*Barling* v. *Peters*, 131 Ill. 78, distinguished.)

4. EQUITY—*equity will not give party benefit of an agreement which he has not performed.* A court of equity cannot substitute a contract different from the one the parties made, nor can it give a party who has not performed his agreement the same benefit as if he had performed it.

APPEAL from the Superior Court of Cook county; the Hon. DENIS E. SULLIVAN, Judge, presiding.

PETIT, CUMMINGS & COLSON, (EDMUND S. CUMMINGS, of counsel,) for appellant.

ALBERT M. KALES, JAMES J. BARBOUR, and EDWARD H. S. MARTIN, for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This is an appeal from a decree as prayed in a bill filed in the superior court of Cook county by Edwin M. Clark against James B. Muir. The two men were acquaintances of long standing and on intimate terms of personal friendship when the transactions here involved occurred. Muir was a lawyer and Clark was engaged in the real estate business. In 1900 Clark, William R. Linn and Charles L. Raymond, as partners in a trading venture, bought a tract of land at the corner of Sheridan road and Devon avenue, extending to Lake Michigan. The title was conveyed to Linn, and at the time of the conveyance a written agreement was signed by the three men for the subdivision and improvement of the property. Raymond agreed to furnish the money required from time to time to pay taxes, assessments and to improve the property. Clark was to give his services in subdividing, improving and selling the property, without other compensation than his share of the profits. When Raymond and Linn had been paid the sums advanced, with interest, the remainder was to be equally divided among the three. The property was all sold at a profit. In November, 1904, Muir and Clark had some talk about a sale of part of it to Muir. A written contract was finally entered into between Linn and Muir for the sale to the latter of a portion of the property for $12,000. This sale was consummated January 3, 1905, by Muir giving his check to Clark for $12,000 and the execution of a deed to Muir by Linn. About January 15, 1905, Clark called at Muir's office and the parties talked about the purchase

by Muir, and the following memorandum, which Clark had previously prepared in duplicate, was signed by the parties:

"It is hereby agreed by and between James B. Muir and Edwin M. Clark, both of the city of Chicago, that whereas, on January 4, 1905, James B. Muir bought and took title in his name to all that part of, [here follows description of the property,] and paid for the above described property the sum of twelve thousand dollars ($12,000); it is understood between the parties hereto that said above described property was bought for the joint benefit and account of James B. Muir and Edwin M. Clark, and that after the said James B. Muir receives all moneys advanced by him for the purchase of said property, together with taxes on same and interest at six per cent per annum, the net profits from the sale of said property shall be divided equally between the parties hereto.

JAMES B. MUIR,
EDWIN M. CLARK."

The memorandum is not dated, but it is agreed it was executed on or about the date of January 15, 1905. At the time of the purchase the property was vacant. Since that time buildings have been placed upon the property by tenants without expense to the owner, and at the time the bill was filed, March 21, 1919, it was producing from $8000 to $10,000 per year rent and was reasonably worth $200,000. No part of it has ever been sold by Muir. Clark averred in the bill filed by him that the property was purchased from Linn for the joint account and mutual benefit of himself and Muir; that Muir was in equity a trustee of one-half of the property for the benefit of Clark, and he asked that Muir be required to convey him the undivided one-half; that an accounting be taken of the rents and profits, and for general relief. The bill alleged that there were profits due Clark from Muir on three other transactions in which they had bought real estate for their mutual benefit and account. Said three other transactions are referred to as the Madison street property, the Whipple street property and the Lake Forest property. There is no substantial controversy as to those three properties but the main controversy relates to the property purchased by Muir from Linn

January 3, 1905, and referred to as the Devon avenue property. The original bill alleged that an understanding and agreement between Clark and Muir that they would take such action that the property could be bought, held and disposed of so as to yield a substantial profit resulted in the signing of the memorandum or agreement. Muir in his answer denied that the property was purchased for the joint account and mutual benefit of himself and Clark. He averred that the memorandum signed by them was entirely independent of the purchase and was signed at the request of Clark without any consideration.

Linn and Raymond asked leave of the court to become parties defendant in the suit. That application was denied but they were granted leave to become parties complainant and filed their bill in the original cause of Clark against Muir. In their bill they alleged the purchase was made by Muir for the joint account of himself and Clark; that Muir knew of Linn and Raymond's interests and of Clark's relation with them. They offered to pay Muir's advances and prayed for an accounting and a re-conveyance of the property. Clark answered their bill, denying he had any interest in the sale to Muir at the time it was made and averring that his contract with Muir was entered into after the sale. The answer avers that the statement that the property was bought for the joint benefit of himself and Muir was not a statement of the exact facts but was intended to impose a status between Muir and himself whereby his rights and interests in the property and profits would be the same as if the premises had been bought by Muir for their joint benefit and account. He filed an amended bill, which omitted the averment of his original bill that the purchase was made by Muir on his suggestion and advice for their joint account and mutual benefit. The amended bill alleges it was mutually understood and agreed between himself and Muir that he (Clark) would take such action

in relation to the property that it could be bought, held and finally disposed of so as to yield a large profit for their mutual benefit, and that their agreement was reduced to writing and is embraced in the memorandum. Muir answered, denying the purchase was made on the suggestion or advice of Clark for their mutual benefit on any previous understanding that Clark would take such action in relation to the improvement of the property that it could be held and disposed of at a profit. He denied the undated memorandum was signed pursuant to an understanding and agreement existing prior thereto, and alleged he purchased the property for his own account and on his own independent judgment and volition.

The issues made on the bill of Linn and Raymond were heard by the chancellor and a decree was entered dismissing their bill for want of equity. They appealed to this court, and the decree was affirmed in *Linn* v. *Clark*, 295 Ill. 22. Subsequently the issues in the latter case were tried in the superior court and a decree entered by the chancellor finding substantially that at the time Muir bought the property he had knowledge of the partnership relations of Linn, Raymond and Clark; that after buying it, and entirely independent of that transaction, Muir and Clark signed the memorandum set forth in the bill; that thereafter Clark proceeded to devote himself to the development of the property, placing a "For Sale" sign on it, procuring tenants for it and sometimes collecting rents and turning them over to Muir. The decree finds the parties co-operated with reference to handling and leasing the property until December, 1918; that Muir informed Clark of rents he had received and made indorsements thereof on Clark's copy of the memorandum; that an indorsement made in September, 1917, "Paid in full," was an acknowledgment that the income had re-paid Muir all money he had invested, with six per cent interest; that in December, 1918, Clark demanded a deed to the undivided one-half of the property

but Muir refused to execute it and asserted Clark had no
rights under the contract or memorandum, as it was with-
out consideration and void; that the Whipple street prop-
erty was a mutual benefit transaction between the parties
and that Clark had overpaid Muir $28.39,—his share in
that transaction; that as to the Madison street property,
which was a transaction for the mutual benefit of Muir
and Clark, Clark was entitled to a one-half interest in the
profits, which amounted to $2392.82; that as to the Lake
Forest property, which was also a joint adventure for the
mutual benefit of the parties, the property had been sold,
but there was an outstanding note and mortgage for the
purchase money of $2000 given by Monahan; that Clark
was entitled to one-half of the note and also one-half the
interest collected by Muir on the note, amounting to $150.
The decree also finds that Muir held Clark's note for $3000
borrowed money; that by the memorandum agreement exe-
cuted January 15, 1905, the parties agreed that Muir had
bought the property referred to as the Devon avenue prop-
erty for $12,000 and had taken the title in his own name;
that they agreed it was bought for the joint benefit and
account of the two men, and after Muir had been re-paid
the purchase money and taxes paid by him, with interest
at six per cent, the net profits from the sale of the property
should be divided equally between them. The decree fur-
ther finds that by the conduct of the parties with reference
to the contract for many years, their mutual labors and co-
operation in handling the property, they are now estopped
from attacking the contract or changing its provisions; that
the property has been since January 15, 1905, held by Muir
for the joint benefit and account of himself and Clark, and
the net profits after Muir had been paid his advances and
interest should be divided equally between them; that there
are now in the hands of Muir net profits amounting to
$24,249.42, one-half of which belong to Clark. It was stip-
ulated by the parties that to save expense and avoid ref-

erence to a master the court might state the account in its decree. The net amount the decree finds due Clark, taking into account the three real estate deals referred to and the note of Clark to Muir, is $12,529.91. The decree further finds Muir has always insisted that when the Devon avenue property was sold, he, alone, should determine when the sale should be made, the purchaser and the price, and for that reason it has been impossible for Clark to make a sale. The decree orders Muir to pay Clark one-half the net profits as stated in the decree and one-half the net profits that may hereafter accrue; that the $3000 note of Clark be canceled; that the property be sold by the master in chancery on certain terms prescribed, and that after the payment of costs and expenses one-half the remainder of the proceeds be paid to Clark and one-half to Muir.

It is very clear that the property was purchased by Muir on his own volition and for his individual account. Whatever claim or interest Clark may have in the property is by virtue of the undated agreement which was executed January 15, 1905. The statement in the argeement that the purchase was made for the joint account of Muir and Clark is contrary to the facts. The situation on January 15, 1905, was, that Muir was the sole owner of the property, had paid for it and had a deed to it. The agreement between him and Clark must be construed in the light of the existing circumstances at the time it was made, together with the subsequent conduct and actions of the parties in relation to the property. It does not purport to give Clark an equitable title to any part or interest in the land. It does not contemplate that Clark shall pay Muir anything for an interest or that if it should be sold at a loss he would bear a part of the loss. Unexplained by extrinsic evidence it is a mere naked promise of Muir, without consideration of any kind, to give Clark one-half the net profits from the sale of the property. The instrument contains no obligation or promise of Clark to do anything to entitle him to a

share in the profits. Extrinsic evidence is competent to be considered in determining what was meant and intended by the agreement. *Minnesota Lumber Co.* v. *Coal Co.* 160 Ill. 85; *Linn* v. *Clark, supra.*

The intention of the parties to the agreement and the effect intended by it are not fully and clearly expressed in the instrument. In our judgment the construction contended for by Clark in his amended bill and in his briefs here, that it was not intended by the agreement to state the facts as to the purchase by Muir nor declare the legal effect thereof but it was intended by the parties to impose a legal status between the two men whereby Clark was given the right to participate with Muir in the ownership of the property and the profits which accrued from it, the same as though it had been purchased by them for their joint benefit and account, is untenable. There is but little evidence in the record, aside from the testimony of Muir and Clark, throwing light on the intention of the parties in entering into the agreement. The substance of the most material part of Clark's testimony is, that he and Muir were acquaintances and friends of long standing; that they had previously had joint account transactions in real estate in which he had the principal responsibility for the sales end of the deals and that Muir knew of his ability and success in that line. Muir completed the purchase and received a conveyance of the property on January 3, 1905. Clark testified that two or three days after Muir acquired the property he was in Muir's office, and Muir stated to him he had some misgivings about his purchase and whether he could make a profit out of it. Clark told Muir if he felt that way about it, if he would enter into a joint deal with him (Clark) like they had in other deals he would handle it so it would produce a profit, and Muir said he would do it. That was just before Muir went to Michigan on account of the illness and death of his mother. Clark testified that he afterwards prepared the agreement, and soon

after Muir's return home he called on him and told him he had prepared "some contracts;" that Muir read them over and signed them, and that he thereafter began to handle the property so as to make a profit. Clark testified he had full charge of the property for about twelve years; that he consulted Muir about everything but that whatever he (Clark) said went. He testified he put a "For Sale" sign on the property, and attended to leasing it for sign boards and other purposes. He talked with different parties about buying it. He testified "we kept raising the price." The property was increasing in value rapidly. Clark further testified that he and Muir agreed in 1917 that the sale price should be $300,000. Clark testified that he several times asked Muir for a deed to one-half interest in the property, and before Muir had received from the property the amount he paid for it and all other expenditures and interest, he (Clark) asked to be permitted to pay one-half and that Muir make him a deed, but that Muir refused his requests and said the property would soon pay for itself and then Clark would be entitled to a deed. He renewed his demand for a deed when Muir made the memorandum "Paid in full," September 18, 1917, but Muir refused. Muir proposed that the property be sold. Clark said he had been offering the property for $300,000, and Muir said he would not want to offer it for less. Clark told Muir if he would not make the deed he would begin suit, and Muir said he would carry out the agreement according to its terms.

Muir, among other things, testified to acquiring title to the property on January 3, 1905; that his mother died in Michigan on January 4, 1905, and he left for that place the morning of the 5th and did not return till the 14th; that a day or two after his return Clark came to his office, and that was the first time he had seen him since he bought the property; that at that visit Clark spoke about the property and asked if he could sell it "right away" and make a good thing for Muir would Muir give him half the profits,

and Muir said he would; that Clark then said he had made a memorandum in writing "that will about fix things," and produced the agreement in duplicate, which they both signed. Muir testified there was a "For Sale" sign already on the property when he bought it. It was vacant property except for sign boards. All improvements placed on the property have been at the expense of the tenants. Muir testified that he himself managed and controlled the leasing of the property and that Clark did not do much in that line. On this subject their testimony is quite conflicting but we do not regard it as necessary to set it out. Clark never produced a purchaser for the property at any time. He never claimed any interest in the property until 1914, when he demanded a deed for one-half interest. Muir refused it and told him he had no interest of any kind until a sale was made. In 1916 Clark again demanded a deed, but Muir refused it and told him he never agreed to give him a deed; that he (Muir) had bought and paid for the property; that it was his; that Clark was to sell it, and if he did so Muir would compensate him. Clark asked Muir how much the property then stood him, whereupon Muir turned to his book in which he kept an account with the property and gave him the statement. Clark asked if there was any objection to making a memorandum on the agreement, and Muir indorsed it thereon from his book. It had already been figured up. Muir said Clark never said anything about paying him any part of the purchase money, and he never told Clark the rents would pay for it and he would then be entitled to a deed. Clark was to procure a purchaser and submit the price to Muir. He did not remember they fixed the price at $150,000 or at $300,000. Clark said it was worth the latter sum. He put different prices on it which he thought he could get for it, but there was never any agreement between them as to what price it would be sold for. Clark talked about buying it himself and wanted an option on it, which Muir gave him at a

price of $140,000. Nothing was said about the option being for a half interest. It was for the purpose of disposing of Muir's property. The property was always for sale. Muir testified that after signing the agreement he regretted having done so; that he was willing to give Clark half the profits if he made the sale; that his undertaking to sell it was the consideration for making the agreement, but he did not sell it; that no definite time was fixed for him to sell it but his agreement was to sell it "right away;" that was the inducement for him to sign the agreement; that the arrangement was for an immediate profit.

The foregoing is by no means a full resume of the testimony of Clark and Muir, but we have endeavored to set out the material substance of what bears most directly on the purpose and intention of the parties in making the agreement. There was some correspondence between them introduced, also testimony and exhibits of other transactions between the two men in handling other real estate, and the testimony of tenants and others relative to the leasing of the property, or parts of it, after the agreement was made, but none of that testimony is of controlling importance in the decision of the case.

Under the decisions of this as well as other courts generally, Clark acquired no title to any interest in the property by virtue of the agreement relied on. The interest he acquired was in any profits realized on a sale made by him. This is well established by the following authorities, which we cite without comment: *Stow* v. *Robinson,* 24 Ill. 532; *Morrill* v. *Colehour,* 82 id. 618; *Roby* v. *Colehour,* 135 id. 300; *MacDonald* v. *Dexter,* 234 id. 517; *Linn* v. *Clark, supra.*

The decision of this case is not controlled, as claimed, by *Barling* v. *Peters,* 131 Ill. 78, and cases cited similar in principle. In the *Barling case* land was originally purchased by Hyman for the joint benefit and account of himself and Robinson, which was not the case here. The price

agreed to be paid was $15,000. There was paid in cash $6000. The deed was made to Hyman and he executed notes for $9000, secured by trust deed on the property. Afterwards a written agreement was entered into between Hyman and Robinson, by which, in consideration of Robinson having advanced the $6000 paid on the purchase, the land was conveyed to him by Hyman subject to the trust deed, and Robinson agreed to pay the notes if necessary or expedient and to advance the money to pay the taxes. Hyman was to sell the land within a year unless otherwise agreed. He was to make no charge for buying the land or for selling, was to attend to the payment of the taxes, and when the land was sold Robinson was to be paid all advances made by him and interest, and the balance of the proceeds was to be divided equally between them. The court held that Hyman was not merely an agent to sell; that the land was bought for the joint account of the two men; that Hyman had an interest in the land and Robinson held the legal title in trust. We agree to the correctness of that decision under the facts there existing, but that case has no controlling force here, the facts being entirely different. In his original bill Clark averred that it was understood between him and Muir that he (Clark) would take such steps that the property could be bought, held and finally sold so as to yield a large profit, but that averment is omitted from his amended bill. This, as we construe the agreement, is simply a case where Muir for his individual purposes bought and paid for the land. After completing the purchase and acquiring title he agreed with Clark that if he would sell it "right away" for a net profit he (Muir) would divide the profits equally with Clark. The only interest Clark acquired was in the profits if he sold it. Under that agreement Muir was obligated to sell if Clark produced a purchaser who would pay a reasonable, fair market value for it. Clark never did produce a purchaser. It would seem the property was rapidly advancing in value,

and Clark was probably influenced by that fact in delaying the sale so as to increase the profits. No time within which a sale was to be made was agreed upon. Muir testified it was to be made "right away," and Clark did begin talking to parties about selling it. No definite time being fixed within which the sale was to be made, the law would require it to be made within a reasonable time according to the nature of the thing to be done. (*Smith* v. *Gear,* 59 Ill. 381; 6 R. C. L. 646, 896.) It signifies nothing that Muir did not insist on the sale being made "right away." Clark was to sell it, and he could not claim to have forever to do so, or that because no time was agreed upon he would be allowed an indefinite number of years. It was his duty to make a sale within a reasonable time. If he had secured a purchaser at a fair and reasonable price, he might, if Muir had refused to sell, have compelled him to perform his agreement. (*Morrill* v. *Colehour, supra.*) Muir never did refuse to sell, for Clark never produced a purchaser. A court of equity cannot substitute a different contract from the one the parties made, (*Stone* v. *Palmer,* 166 Ill. 463; *Kerting* v. *Hilton,* 152 id. 658; *Carpenter* v. *Plagge,* 192 id. 82;) nor can it give a party who has not performed his agreement the same benefit as if he had performed it.

Fourteen years elapsed from the time the agreement was signed before the original bill of Clark was filed, and counsel for Clark assert that Muir is now estopped to deny Clark's interest, but we are unable to see where any action or conduct of the parties affords any element upon which an estoppel could be based. As we view it, Clark can blame no one but himself for not selling the property, and as his interest was to be in the profits that might be derived from a sale, he is not entitled to an accounting for the Devon avenue property nor to have it sold for the purpose of settling any interest he has in it, for he has none. In that respect the decree is erroneous.

There were other transactions involved in the accounting, but as we do not understand there is any very serious disagreement about them we have not carefully considered them.

The decree is reversed and the cause remanded to the superior court, with directions to re-state the account, omitting therefrom anything in connection with the Devon avenue property.    *Reversed and remanded, with directions.*