MADISON NATIONAL BANK ET AL. *v.* NEWRATH ET AL.

[No. 322, September Term, 1970.]

*Decided March 29, 1971.*

*Motion for rehearing filed April 28, 1971; denied May 3, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Henry H. Glassie,* with whom were *Hershel Shanks, James M. Kefauver, Glassie, Pewett, Beebe & Shanks* and *Stedman Prescott, Jr.,* and *Staley, Prescott & Ballman* on the brief, for appellants.

*Eugene Hettleman* and *Brainard H. Warner, III,* for appellees.

FINAN, J., delivered the opinion of the Court.

In this appeal we are called upon to determine the nature of the interest which Robert B. Weiss, one of the defendants below, had in Pike Associates, styled as a joint venture (Pike Associates) and which owned a leasehold estate improved by the Pike Shopping Center, Montgomery County, Maryland. At various times Weiss pledged his interest in the leasehold estate and in Pike Associates as security for loans. The question now becomes important as to whether Pike Associates was a partnership or something less, and, as corollary to this issue, whether the interest used as security represented property owned by Weiss as a tenant in common or whether it was partnership property. As the facts are developed it will likewise become apparent that the determination of what type of commercial creature Pike Associates is, has a bearing on whether we must consider, in relation to other issues in the case, certain aspects of the Uniform Partnership Law and the Uniform Commercial Code. The Circuit Court for Montgomery County held that Pike Associates was not a partnership. In this we think it erred.

The land on which Pike Shopping Center is located is leased on a long term basis to Messrs. Haft, Weiss and Wine, trading as "Pike Associates, a Joint Venture." The joint venture was formed by agreement on July 9, 1965, whereby Haft, Weiss and Wine agreed "to invest, as their respective shares of the capital of the Joint Venture herein created, all of their respective rights, titles and interests in and to the aforesaid leasehold interest in the Property." The agreement also provided for the management and operation of the shopping center for a period of 25 years during which period the parties would share equally in the profits and losses of the business. The agreement provides that if the joint venture is terminated for certain specified reasons, then "Each member [of the joint venture] shall be the owner of an individual interest in the property formerly owned by the joint venture as a tenant in common with the other surviving or remaining members of the joint venture."

In July, 1967, Fidelity Associates, Inc. (Fidelity) made Weiss a loan in the amount of $150,000; however, apparently to avoid the usury law, the maker of the note was the W. & W. Corporation, a corporation controlled by Weiss. Although the loan was for $150,000 the note was for $165,000 with interest at 7%. Weiss individually endorsed the note. Also, to secure this debt, Weiss and his wife executed a deed of trust to Walter D. Newrath and Henry S. Snyder, as trustees for the benefit of Fidelity, conveying "all of their rights, title, and interest" in the leasehold estate. This is the same interest which had previously been conveyed as Weiss' contribution to the Pike Associates Joint Venture. The deed of trust refers to the interest as "all of the rights, title and interest of the parties of the first part [Robert B. Weiss, Alma B. Weiss, his wife] (being an undivided one-third interest as a member of the joint venture known as Pike Associates) in the leasehold estate of the hereinafter described property * * *." This deed of trust was dated July 19, 1967, and recorded among the land records of Montgomery County the following day.

Fidelity had previously sought to insure the validity of this deed of trust with the Capitol Title and Escrow Corporation. Capitol Title refused to insure this trust instrument (apparently because the leasehold was owned by the joint venture and not individually by the parties to the joint venture agreement). Fidelity sought to fortify its position by obtaining a security interest in Weiss' interest in Pike Associates. It did this by obtaining an assignment in trust dated July 19, 1967, of that interest. It should be noted that the parties to this appeal agree as to the validity of this last mentioned security interest; however, it was not perfected by the filing of a financing agreement as required by the Uniform Commercial Code (U.C.C.), Maryland Code (1964 Repl. Vol.), Art. 95B, § 9-302. Prior to the closing, Fidelity was advised by the title company that this assignment in trust was not in recordable form; however, it took no steps to have a financial statement executed, and consummated the loan.

We now turn to the part played by the Madison National Bank (Madison), one of the appellants, in the rather involved financial dealings of Weiss. In 1965, Madison lent $150,000 to W. & W. Corporation. The debt was extended by several renewal notes. On March 20, 1968, the debt was again extended to March 20, 1969. In consideration of this extension, Weiss (and his associate Wine) executed security agreements giving Madison a lien on their interests in Pike Associates. Each of these liens was perfected under the Uniform Commercial Code by the filing of the financing statement.

On November 1, 1968, Weiss and Wine made an assignment in trust to trustees for the benefit of Madison of "all the rights, title and interest which each of the said assignors had in and to the Joint Venture known as Pike Associates." This assignment of trust was also perfected by the filing of a financing statement in the office of the Clerk of the Court for Montgomery County on November 15, 1968. Accordingly, at the time of the trial Madison had two liens on Weiss' interest in Pike Associates, one securing a debt of $151,017.11 and the second securing a

total debt of $806,818.31, which last figure includes the aforementioned debt of $151,017.11 as well as other debts owed by Weiss to Madison which are not relevant to the case at bar.

Madison initiated action in the lower court by a suit to enjoin the foreclosure of the deed of trust held by Fidelity and further sought to have the court declare its own lien superior to that of Fidelity. The chancellor summed up his findings below by stating:

> "* * * The principal contention of the plaintiff is that the deed of trust [Fidelity's security interest] is invalid because a sale of a partnership asset on behalf of the one partner without the approval of the other partners is contrary to [Art. 73A], Section 25 (2) (b) of the Uniform Partnership Act which says that 'a partner's right in a specific partnership property is not assignable except in connection with the assignment of the rights of all partners in the same property.' The defendants contend that the defendants, Weiss and wife, are not partners in the property described in the deed of trust but are joint venturers. A careful reading of the agreement between Haft, Wine and Weiss satisfies the Court that they are not partners but are joint venturers. See Vol. VIII, Maryland Law Review, page 22 to 40. Since the security agreements referred to in the Bill of Complaint were used for the sole purpose of additional security and no action has been taken under the same, it will not be necessary for the Court to pass upon its validity as such. The Court is, therefore, of the opinion that the deed of trust and note secured thereby are valid and subsisting liens on the property described in the deed of trust. * * *"

We disagree with the lower court's finding that Fidelity's deed of trust was a valid and subsisting lien on the

leasehold property. The lower court erred not only in failing to find Pike Associates to be a partnership, but it begged the question in finding it a joint venture. There is ample authority, including past decisions of this Court, holding that a joint venture and a partnership *are* indistinguishable; however, we would prefer to say that they *may* be indistinguishable and are in this case. *Hobdey v. Wilkinson,* 201 Md. 517, 525-527, 94 A. 2d 625 (1953); *Brenner v. Plitt,* 182 Md. 348, 355-356, 34 A. 2d 853 A. 285 (1927); J. Mullen, *Joint Adventurers,* 8 Md.L. (1943); *Atlas Realty Co. v. Galt,* 153 Md. 586, 590, 139 Rev. 22, at 34-35, 38; see also *McBriety v. Phillips,* 180 Md. 569, 573-574, 26 A. 2d 400 (1942); *Morgart v. Smouse,* 103 Md. 463, 467-468, 63 A. 1070 (1906).

In *Atlas,* Judge Offutt writing for the court tacitly demonstrates the ephemeral nature of any distinction between a joint venture and a partnership by suggesting that there may be a distinction but immediately thereafter dispelling the illusion thus created, stating:

> "* * * While a joint adventure may be distinguished from a partnership [failing to indicate in what manner], nevertheless they are both so much alike that it is often very difficult to differentiate them. And to establish either it is necessary to do more than show that the persons said to be so associated are to share in the profits of a transaction. *Clark v. Muir,* 298 Ill. 548; *Manker v. Tough,* 79 Kan. 46, 33 C. J. 844. But it is essential to show that they have a joint proprietary interest, or that they are to share losses as well as profits, or that they have a joint control over the subject matter of the adventure or of the manner in which it is to be carried out. *In fine, there seems to be no 'real distinction between a joint adventure, and what is termed a partnership for a single transaction.' Rowley on Partnership,* par. 975." (Emphasis supplied.) 153 Md. 590.

Later, in *Hobdey, supra,* this Court tied the knot a bit

tighter between a joint venture and a partnership, Sobeloff, C. J., observing:

"* * * But the self-characterization of the parties as 'joint adventurers', and their agreement to share both profits and losses, coupled with the evidence of a course of conduct which the appellees permitted Murdock to engage in with respect to this real estate development strongly indicate *a joint adventure, which is really in law a partnership for a single transaction or for a limited number of transactions. Southern Can Co. v. Sayler,* 1927, 152 Md. 303, 136 A. 624; *Atlas Realty Co. v. Galt,* 1927, 153 Md. 586, 139 A. 285. See also 36 *Virginia Law Review,* 425." (Emphasis supplied.) 201 Md. 525-526.

And in *McBriety, supra,* we said:

"If parties enter into a contract such as the law considers to be a partnership, they become partners, whether they call themselves such or not." 180 Md. 573-574.

Mr. Mullen's article in 8 Md.L.Rev. 22 (1943) points out at page 25 some distinctions between a joint venture and a partnership. We recite them to illustrate the technical character of the distinctions when they do exist. The writer of the article points out that a joint adventurer can sue a co-adventurer at law but a partner cannot sue another partner until their mutual accounts have been liquidated; a corporation may engage in a joint adventure where the enterprise is within its chartered powers, though it can not become a member of a partnership[1]; two corporations may engage in a joint adventure or a corporation and an individual may engage in a joint adventure but they may not become partners. The article also points out that upon the insolvency of a partnership, firm creditors have priority against firm property over

---

1. This common law rule has been changed by statute in Maryland. See Code (1968 Repl. Vol.), Art. 1, § 15; Code (1966 Repl. Vol.), Art. 23, § 9 (a) (7); Code (1970 Repl. Vol.), Art. 73, § 1 and Art. 73A, §§ 2, 6.

obligations of the separate partners and that this should not be true in the case of a joint adventure for the reason that no credit would be given to the joint debtors upon the strength of joint property. These distinctions (enumerated in Mr. Mullen's article) notwithstanding, it is clear that the Maryland cases which have dealt with the subject have not seen fit to observe any distinction between a joint adventure and a partnership and certainly there is nothing peculiar to the facts of the case at bar which recommend that it be given different treatment.

The Uniform Partnership Act, which has been in effect in Maryland since 1916, defines a partnership as "an association of two or more persons to carry on as co-owners a business for a profit." Maryland Code (1970 Repl. Vol.), Art. 73A, § 6. Of similar import is the definition of a partnership found in 40 Am. Jur. *Partnership*, § 2, p. 126, which relies on the classic definition of Chancellor Kent who defined a partnership "as a contract of two or more competent persons to place their money, effects, labor and skill, or some or all of them, in lawful commerce or business and to divide the profit and bear the loss in certain proportions." We think Pike Associates, serving the purpose of several individuals, who had contributed personal assets to bring it into being, for the building, financing, leasing, managing and operating for mutual profit a major shopping center over a period of 25 years or more, comes within the ambit of the Uniform Partnership Act. This being the case, the lower court's theory that Weiss' interest in the leasehold was that of a tenant in common and that he could convey it by way of a deed of trust as individually owned property does not hold water. Weiss' interest in the leasehold was contributed by him as his share of the capital contribution to Pike Associates and, as such, it became partnership property.

Section 8 of the Uniform Partnership Act (Art. 73A) provides:

"(1) All property originally contributed to or

subsequently acquired by purchase or otherwise on account of the partnership is partnership property."

Section 25 provides in subsection 1 that:

"A partner is co-owner with his partners of specific partnership property holding as a tenant in partnership."

The same Section 25 consistently provides that "a partner's right in specific partnership property is not subject to attachment or execution except on a claim against the partnership" and that "on the death of a partner his right in specific partnership property vests in the surviving partner or partners, except where the deceased was the last surviving partner, when his right in such property vests in his legal representative" and "a partner's right in specific partnership property is not subject to dower, curtesy, or allowances to widows, heirs, or next of kin." [2]

In *Kay v. Gitomer*, 253 Md. 32, 251 A. 2d 853 (1969), this Court held that an association was a partnership though there was no formal agreement and, accordingly, that land held by the parties to the agreement as tenants in common was in fact property held as tenancy in partnership under the Uniform Partnership Act, regardless of the fact that the title appears as a tenancy in common on the land records. We further held that the signature of one of the two partners was sufficient to convey title to partnership property and that the wives of the partners did not have to join in the contract or deed. We further determined that the purchaser could obtain specific performance of the contract executed by one partner to convey partnership real estate.

This Court had earlier discussed the same question in *Williams v. Dovell*, 202 Md. 351, 96 A. 2d 484, 487 (1953). In that case the partners bought property and took title

2. It is noted that the estates of dower and curtesy were abolished in Maryland effective January 1, 1970. Maryland Code (1969 Repl. Vol.), Art. 93, § 3-202.

as joint tenants, but had agreed that upon the termination of the partnership the property should be held in tenancy in common. The court upheld the agreement with respect to title effective upon dissolution of the partnership. (It is interesting that the Pike Associates Agreement also provides for such a result after termination of the partnership.)

In *Williams* the Court stated:

"* * * With that exception [purchase for value without notice], the legal title of individual partners is an empty technicality. The legal title to partnership property cannot be conveyed, devised or inherited as the individual property of any of the partners either as joint tenant or as tenant in common. In so far as the beneficial individual interests of the partners are concerned, it is immaterial whether they are regarded technically as joint tenants or as tenants in common. The partner's interest in the partnership, which is a personal chose in action, is all that he may assign or bequeath, and upon his death intestate that interest passes to his administrator as personal property." 202 Md. 357.

*Cf. Vlamis v. De Weese,* 216 Md. 384, 394, 140 A. 2d 665 (1958), a case in which one Malin owned real estate. He conveyed a one-half interest to Diebert as tenant in common. The court found a partnership from surrounding circumstances. After Malin's death, his executor assigned all assets of the partnership to Diebert. It was held that Malin's wife did not take by devise any interest in the land recorded of record as a tenancy in common. Since the land was partnership property, Malin's interest was personalty, regardless of the record title, and all interest in the land passed by assignment of Malin's executor.

In view of what we have expressed, the deed of trust given by Weiss to Fidelity in July of 1967 to secure the

$165,000 note is invalid, as he sought to convey, as individually owned property, that which was partnership property. The chronology of the facts would indicate that Fidelity viewed this deed of trust with skepticism, and apparently in contemplation of Capitol Title's not insuring the trust instrument, Fidelity sought additional security. This brings us to the consideration of the assignment in trust made by Weiss to Fidelity of his interest in Pike Associates. Fidelity attempted by this assignment to obtain an effective security interest in Pike Associates, and it may well have done this but for the fact that they failed to perfect their security interest by filing a financing statement as required by the Uniform Commercial Code. Code, Art. 95B, § 9-302.

The lower court, having found (in error) that the deed of trust executed by Weiss to Fidelity in July 1967 was a valid and subsisting lien on the leasehold property, had no occasion to consider the validity and legal effect of Weiss' assignment in trust of his interest in Pike Associates to Fidelity. Madison agrees that this was a valid assignment of a security interest but attacks it as having never been perfected by the filing of a financing agreement and that it is therefore subordinate to Madison's security interests which have been perfected by the filing of financing agreements.

The question then resolves itself as to whether Fidelity's or Madison's security assignment has priority. The law appears abundantly clear that the first assignee who perfects his lien by filing a financing statement under the U.C.C. shall prevail. It is clear from the record that while Fidelity obtained the first assignment of a security interest from Weiss, yet Madison was the first to obtain a properly executed financing statement and to record the same. Madison filed three successive financing statements with respect to Weiss' partnership interest in February, March and November of 1968. Fidelity did not file any.

The U.C.C. applies to security assignments of personal property including general intangibles and contract rights

and thus to security assignments of partnership interest. U.C.C., § 9-102. The U.C.C. also expressly provides that the financing statement must be filed in order to perfect all security interests with certain exceptions which are inapplicable to this case. U.C.C., § 9-302.

The U.C.C. expressly provides that an unperfected security interest, that is, one with respect to which a financing statement has not been filed is subordinate to the rights of persons who have filed a financing statement. U.C.C., § 9-301 (1) (a) and § 9-312 (5) (b).

In an effort to neutralize the favored position which Madison secured by perfecting its security interest, Fidelity attacks Madison's liens on three fronts. First, Fidelity contends that the security agreement of Madison is an assignment of rents which must be recorded among the land records, and is not a security interest within the meaning of the Uniform Commercial Code. The short answer to this contention is that Fidelity is confusing the business of a partnership with a partner's interest in the partnership profits. It does not follow that because a partnership business happens to include the leasing of real estate that an assignment of a partnership interest, *i.e.* a partner's share of the profits and distribution of the partnership is an assignment of the partnership's real estate, leases or rents. An assignment of rents is one thing and an assignment of the interest in the profits which may be achieved by way of leasing is something else again; under poor management and adverse economic conditions there may well be rents, but no profits to distribute. Weiss' interest in Pike Associates is actually personalty and it is a proper subject for a security interest under the terms of the U.C.C., § 9-102.

Second, Fidelity argues that Madison had knowledge of Weiss' assignment in trust to Fidelity of his interest in Pike Associates. They arrive at this conclusion on the theory that Madison had knowledge of Weiss' deed of trust of the leasehold to Fidelity (which we have held invalid) and that somehow this knowledge also gave Madison knowledge of Weiss' assignment in trust of his in-

terest in Pike Associates to Fidelity. Without evidence to support this contention, it is a non sequitur. Relying upon this assumed knowledge, Fidelity attacks Madison's secured position by a specious interpretation of U.C.C., § 9-301 (1) (b), which provides that lien creditors "without knowledge" enjoy a preferred position over security assignees who have not perfected their security assignment by filing a financial statement. Fidelity would classify Madison as a lien creditor *with* knowledge, and therefore not eligible for priority treatment under § 9-301 (1) (b). The fallacy of this proposition is that Madison is not a lien creditor within the definition of the U.C.C. but is a lender taking security for a loan. Additionally, it did not have knowledge of the existence of the assignment of Weiss' security interest in Pike Associates to Fidelity. Madison is a secured party under U.C.C., § 9-312 (5) (b). Even if we were to hold that Madison had knowledge of the assignment in trust of Weiss' interest in Pike Associates to Fidelity, such knowledge would not have prevented it from obtaining priority over Fidelity's interest by a timely filing of a financing statement. Official Comment (Example 2) to U.C.C., § 9-312.

Third and finally, Fidelity seeks to void Madison's security interest in Pike Associates by attacking the constitutionality of the U.C.C., under which Madison's priority was established. The Maryland version of the Uniform Commercial Code (U.C.C.) was adopted on April 30, 1963 by virtue of Chapter 538 of the Acts of 1963, codified as Article 95B of the Maryland Code. The statute is detailed in nature, and embraces some 163 pages of the official edition of the 1963 Laws of Maryland. And, say the appellees, it is unconstitutional because it contravenes Article III, § 29 of the Maryland Constitution, which provides that "every law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title."

One of the earliest statements of the purpose of § 29 of Article III (originally adopted in the Constitution of

1851) was given in *Davis v. State,* 7 Md. 151 (1854), as follows:

"The object of this constitutional provision is obvious and highly commendable. A practice had crept into our system of legislation, of engrafting, upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing new strength for it, members were often induced to sanction and actually vote for such provisions, which if they were offered as independent subjects, would never have received their support. In this way the people of our State, have been frequently inflicted with evil and injurious legislation. Besides, foreign matter has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not unfrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew anything of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted." 7 Md. 160.

More than one hundred years and over one hundred decisions later on the same subject, our predecessors noted:

"Section 29 of Article 3 of the Constitution has been involved in cases before this Court on numerous occasions. It has been included in the last three Constitutions of this State, and its purposes are to prevent the combination in one act of several distinct and incongruous subjects, and to inform the members of the legislature of the nature of bills introduced, which are usually read to them by their titles only, and to permit

the citizens of the State to know of proposed legislation. The general rule of its construction is that every presumption favors the validity of the statute, and reasonable doubt is enough to sustain it. The appellants here assert no claim that the statute embraces more than one subject. The cases arising under this section of the Constitution relating specifically to the requirement that the subject be described in the title may be generally divided into those in which it is contended the title is not sufficiently descriptive, and those where it is claimed the title is misleading. This Court has consistently held that the Constitution is complied with if the title of the legislation fairly advises the legislature and the public of the real nature and subject matter of the legislation sought to be enacted." *Leonardo v. County Commissioners,* 214 Md. 287, 298-299, 134 A. 2d 284 (1957).

For a summary of the constitutional history of this provision see Everstine, *Titles of Legislative Acts,* 9 Md.L. Rev. 197 (1948).

Applying these considerations to the case at bar, the question must ultimately be whether or not the title of Chapter 538, Acts of 1963, "fairly advises the legislature and the public of the real nature and subject matter of the legislation." The answer is in the affirmative.

The appellees' main contention in this regard is that the title of Chapter 538 does not adequately describe the contents of the bill. They take specific issue with the fact that, although § 2-725 of the U.C.C. provides for a four year period of limitations in contracts for the sale of goods (thereby changing the former twelve year period of limitations for contracts under seal and the three year limitations period for other sales contracts), no mention is made in the title of this "drastic change" in the law. Appellees contend that this alleged weakness in the titling of § 2-725 of Chapter 538, although not a section specif-

ically involved in the case at bar, is fatal to the entire Maryland U.C.C. and therefore bars any claims which the appellants might have.[3]

The title of the act in question indicates that it is a Uniform Law, and enumerates the many prior pieces of legislation which it repeals. A reading of the title of the Act indicates that it is an extensive and thorough overhaul of the then-existing laws in Maryland governing commercial practices in the State. While it does not enumerate many of the changes effected by the Act, it puts even the casual reader on notice of the nature and scope of the revisions in the existing law, and gives adequate notice to interested parties that they would be well-advised to peruse the details of the statute.[4] As we said in *Leonardo*:

> "* * * In order to do this [advise interested persons of the nature and subject matter of the legislation], it is unnecessary that the title be an abstract of the text of the proposed statute, nor need mention be made of the means and the methods by which its purpose is to be accomplished. *Bond v. Mayor and C.C.*, 116 Md. 683, 688, 82 A. 978; *Painter v. Mattfeldt*, 119 Md. 466, 87 A. 413." 214 Md. 299.

Admittedly, there are in Chapter 538 of the Acts of 1963 innumerable instances of specific provisions not referred to in the title. If the logic applied by the appellees in the case at bar were applied to the entire Maryland Code, much of the Code could be declared invalid. When the General Assembly adopts a Uniform Law which em-

---

3. Aside from the reasons which we set forth in the body of this opinion upholding the constitutionality of the Act, the appellees' argument ignores the existence of § 1-108 of the Maryland U.C.C., which is the statute's "severability clause."

4. It is interesting to note that, perhaps in consideration of the dictates of Article III, § 29 of the Maryland Constitution, the title to Chapter 538 is an expanded version of the one recommended by the Commissioners on Uniform Laws in their proposal of the U.C.C. See Chapter 538, 1963 Laws of Maryland. Cf. Vol. I, Uniform Commercial Code (U.L.A., Master Ed.), p. 1.

braces the whole spectrum of socio-economic activity in a given field, it is unrealistic to postulate that the titling of such a bill must cover all of the ramifications of the Act.

The appellees also generally allege that the Maryland statute embraces more than one subject, and thereby violates the Maryland Constitution. The U.C.C., extensive as it is, deals with but one general subject — commercial transactions—in its many related aspects. By the very nature of such uniform legislation, as suggested by the title, one should be put on notice that the intent and purpose of the Act is to provide comprehensive legislation in a given field and that it would embrace not only that which is the topical thrust of the legislation (in the instant case commercial transactions) but matters germane to the main subject matter. We have previously acknowledged this fact when Chief Judge Hammond, speaking for the Court, said:

> "The basic plan of Article 95B [the Maryland U.C.C.] is to deal with the normal and ordinary aspects of a commercial transaction from start to finish by means of nine subtitles, eight of which are devoted to a specific phase or facet of commercial activity." *Universal C.I.T. Credit Corp. v. Congressional Motors,* 246 Md. 380, 387, 228 A. 2d 463 (1967).

Before leaving the question of the titling of Chapter 538, some mention should be made of the extensive publicity given to the U.C.C. in Maryland in the years prior to its adoption. It had been the subject of much study by banking associations and bar association committees, culminating in the enactment of a Joint Resolution of the 1961 General Assembly allowing for the Governor to appoint a commission to study the U.C.C. and make recommendations to the 1963 General Assembly. For almost two years, the Commission studied the proposed legislation, and widely distributed copies of its report recommending adoption of the U.C.C. in Maryland. After ex-

tensive hearings in the Maryland State Senate and the House of Delegates, Senate Bill No. 77 was enacted as Chapter 538 of the Acts of 1963. Given this rather widespread pre-enactment publicity, it would appear that such publicized legislation is not the evil against which Article III, § 29 of the Maryland Constitution was designed to protect the public and the Legislature.

In sum, the appellees have favored us with no authorities to support their constitutional arguments, and our research has failed to uncover anything of a persuasive nature. The title to the bill in question gave adequate notice of the contents of the Act. It was neither necessary nor desirable that the title be drawn to reflect all the details of the statute itself. And, inasmuch as the Act contains no incongruous or unrelated features, it should be upheld. See *Baltimore Transit Co. v. Metropolitan Transit Authority,* 232 Md. 509, 194 A. 2d 643 (1963). *Cf. Clark's Park v. Hranicka,* 246 Md. 178, 227 A. 2d 726 (1967) ; *Buckheit v. Buckheit,* 10 Md. App. 526, 272 A. 2d 54 (1970).

In both *Clark's Park, supra,* and *Buckheit, supra,* in contrast to the instant case, the subject matter of the bill related to a narrow segment of the shoplifting law in one instance *(Clark's Park)* and the divorce law in the other *(Buckheit).* The General Assembly in both of those cases was addressing itself to isolated pieces of legislation and not legislating on a broad front covering a general area of a particular field of law; consequently, neither members of the public nor the Legislature who read the titles of the acts involved were put on notice of the contents of the body of the acts because of the narrow scope of the title. In other words, by reading the titling of Chapter 269 of Laws of Maryland, 1961, which dealt with shoplifting, one would not be alert to the fact that the body of the bill also made a fundamental change in the civil remedy attending a false arrest *(Clark's Park),* and by reading the titling of Chapter 656 of the Laws of 1969, which dealt with a new ground for divorce *(Buckheit),* one would not be aware that the body of the act also en-

larged the court's jurisdiction over property rights in a divorce action. We would further add, by way of contrast, that neither of these two last mentioned acts received the widespread publicity prior to their enactment, as attended the passage of the Uniform Commercial Code.

To accept the appellees' contention would quite likely jeopardize much of the comprehensive legislation recently enacted in Maryland, which receives, for the most part, more study, consideration, discussion, and deliberation than isolated pieces of legislation. Such a result would do violence to a section of the Constitution adopted to prevent "foreign matters" from being "stealthily incorporated" into a law "during the haste and confusion always incident upon the close of the sessions of all legislative bodies." *Davis v. State, supra,* at 160.

> *Decree reversed and case remanded for the entry of a decree consistent with this opinion; appellees to pay costs.*