PANITZ, ᴇᴛ ᴀʟ. *v.* COMPTROLLER OF THE
TREASURY AND STATE TREASURER

[No. 125, September Term, 1967 (Adv.).]

502

*Opinion filed September 13, 1967.*

504

/s/ Hall Hammond
Chief Judge

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*George W. Liebmann* and *Lawrence F. Rodowsky*, with whom was *Shale D. Stiller* on the brief, for appellants.

*Francis B. Burch, Attorney General, Jon F. Oster, Assistant Attorney General,* and *Thomas A. Garland, Assistant Attorney General,* with whom was *Edward L. Blanton, Jr., Assistant Attorney General* on the brief, for appellees.

HAMMOND, C. J., delivered the opinion of the Court.

This Court by per curiam order held on June 14, 1967, that Ch. 142 of the Laws of 1967, sometimes referred to as the Agnew-Hughes-Lee bill (or the amended Cooper-Hughes bill) was invalid and ineffective as a Supplementary Appropriation Bill but was prima facie valid as other legislation. The grounds for holding Ch. 142 to be invalid and ineffective as an appropriation bill were stated in the order to be that the enactment violated:

> "the requirement of Section 52 (8) of Article III of the Constitution of Maryland that every appropriation not made by the Budget Bill 'shall be embodied in a separate bill limited to some single work, object or purpose therein stated,' and * * * it does not make 'an appropriation by Law' as required by Section 32 of Article III of the said Constitution."

Chapter 142 increased the State income tax to an extent estimated by the Fiscal Research Bureau to produce for fiscal 1968 $120,264,100 over and above the amount to be produced by the existing income tax law for the same year and contemplated the appropriation of this sum for State aid for increased local po-

lice protection, for schools and for unrestricted State grants to subdivisions of the State. Chapter 199 of the Laws of 1967, the Budget Bill, appropriated for some of these purposes $21,290,-373 of the expected increase, contingent upon the enactment of Ch. 142. The difference of $98,973,727 between the estimated additional revenues of $120,264,100 and the $21,290,373 appropriated by the Budget Bill was either effectively appropriated by Ch. 142, as the appellees, the Comptroller of the Treasury and the State Treasurer, claimed or was not appropriated at all, as the appellants claimed and this Court held.[1]

The situation in Maryland before the establishment of the executive budget system by amendment of the Constitution was well described by the late Hooper S. Miles, long Treasurer of Maryland, in his essay, *The Maryland Executive Budget System*. He said (pages 8 and 9) :

> "It was customary, under the former method, for the Governor to appear in person before a joint meeting of the members of the House of Delegates and the Senate, at the beginning of every regular session of the Legislature, and to address them on 'the condition of the State',—in the course of which he was expected to direct their attention to the essential needs of the State, and to specifically recommend to their consideration such measures as he judged necessary. Having thus discharged the responsibility imposed upon him by the Constitution, the Governor must thereafter await the final disposition of his recommendations by the Legislature, whose members were free to adopt, alter or entirely ignore any or all of them, except in so far as the Governor, by virtue of his prestige and his influence with the members of the Legislature, might affect the course of his recommendations through the Legislature.
>
> "It is true, the Governor then had the 'power to dis-

---

1. Chapter 1 of the Special Session of 1967 appropriated the $98,973,727 unappropriated by Ch. 142 of the Laws of 1967 so as to permit the effectuation of the several works, objects and purposes of said Ch. 142 as therein set forth and specified.

approve of any item or items of Bills making appropriations of money' and to thus void the items which he disapproved. However, his use of this veto power on individual items had to be exercised with rare discrimination and with an intimate understanding of the temper of the Legislature, to avoid the danger of antagonizing powerful groups in the Legislature, and thereby jeopardize all of his recommended measures. * * *

"The power to fix the fiscal policies and determine the course of the fiscal operations of the State was, therefore, exclusively vested in the Legislature, subject only to the mild restraint of the limited veto powers of the Governor, and whatever power of persuasion he might be capable of exercising with individual members of the Legislature.

"The old method often witnessed 'log-rolling' or 'you help me and I'll help you' tactics among many of the members of the Legislature in their efforts to insure passage of the particular appropriations in which they had some selfish or political interest. It was not unusual for excessive appropriations to result from such tactics and also from the pressure of political and professional lobbyists; and, almost as frequently, some of the most important activities or needs of the State were either overlooked or sadly neglected in what was commonly termed, the 'Pork Barrel' scramble."

Emerson Harrington, who served as Governor from 1916 to 1920, in his monograph called "The First State Executive Budget," 8 *Proceedings of the Academy of Political Science* (1920), pp. 18-19, 25, wrote of the situation before the adoption of the budget amendment:

"The Finance or Ways and Means Committee did not bring out the [general appropriations] bill until almost the last moment. Then the bill carrying all the expenditures for the state departments and the state government was finally passed in the last hours under a suspension of the rules, generally allowing each senator or delegate practically what he wanted for his own

county or locality, regardless of the amount appropriated and leaving it to the executive to do the paring. In our state the executive, it is true, could cut down or veto the separate items of an appropriation bill, but I understand that in many states even this cannot be done. The members of the two committees appropriated this money upon no scientific or expert plan and had not before them any synopsis or summary either of the revenues or their contemplated expenditures. Largely it was a question of logrolling and of senatorial or delegate courtesy. In our state we had also a system of continuing or annual appropriations, which when marked annual would go on forever as appropriations without any further legislative action. Some of these appropriations of ours were of over 100 years' standing, and most of them were not known to exist by the average member of the legislature."

To correct the fiscal dilemma of the State and to prevent its recurrence the Legislature proposed and the voters approved a constitutional amendment which now is embodied in the Constitution as § 52 of Art. III. The amendment had been prepared by a Commission appointed by the Democratic State Convention held in Baltimore in 1915. The Commission, designated "The Commission on Efficiency and Economy," was chaired by Dr. Frank J. Goodnow, president of Johns Hopkins University. Dr. Goodnow, a noted political scientist, had been a member of the national Commission on Efficiency and Economy appointed by President Taft, which in 1912 issued a report on the need for a national budget, which served as a stimulus for the reforms in Maryland. Members of the Maryland Commission, in addition to Dr. Goodnow, were Alfred Pearce, a former Judge of the Court of Appeals, Joseph D. Baker, B. Howell Griswold, Jr., Philip D. Laird, William Miles Maloy, and Neal Parke, later a Judge of this Court. This Commission declared that the purpose of its proposed amendment, § 52 (8), was to prevent the General Assembly from appropriating any money except by way of an appropriation bill which must be either a Budget Bill or a Supplementary Appropriation Bill as defined and limited by the Constitution.

508

Section 52 may be summarized generally as follows: The Governor must prepare and submit to the Legislature a budget containing a complete plan of estimated income and proposed expenditures for the ensuing fiscal year, including specified mandatory appropriations such as those for the General Assembly, the judiciary and the servicing of the State debt. The Legislature cannot increase any of the appropriation items set out in the budget (other than those for the judiciary and the General Assembly) but it can strike out or reduce items therein other than those for the State debt, the judiciary, the provisions made by law for the establishment and maintenance of the public schools, and the payment of salaries required to be paid by the Constitution. After the Budget Bill has finally been acted upon by both houses, additional appropriations may be made by a majority of the Legislature provided:

(a) "Every such appropriation shall be embodied in a separate bill limited to some single work, object or purpose * * *."

(b) Each such appropriation bill "shall provide the revenue necessary to pay the appropriation thereby made [by] a tax, direct or indirect, to be levied and collected as shall be directed in said bill."

(c) Each such bill is, however, subject to the right of the Governor to veto it, in accordance with the provisions of Section 17 of Article 2 of the Constitution.

The purpose and aims of the Commission in recommending the executive budget plan and the requirements of controlled and restricted supplemental appropriations by the Legislature were explained in its report—printed in the *Journal of Proceedings of the Senate of Maryland* for the Legislative Session of 1916, pp. 129-134—and in a series of articles by its members which were printed in The Baltimore Sun in the fall of 1916 and may be found in the pamphlet published in the winter of 1917, called *The Maryland Budget Amendment,* prepared by Dr. Horace Flack of the Department of Legislative Reference.[2] In summarizing the provisions for supplementary appropriation bills, Dr. Flack said (p. 53):

"In order to meet the objection, however, that the Governor might misuse his power, either by starving objects which the Legislature deems worthy or by trade with individuals or localities, the Committee thought that the power of initiation of financial legislation should be left with the Legislature, subject to but two restrictions: first, such power not to be exercised until after the budget is finally disposed of by both branches of the Legislature; second, that such appropriations must be made by a separate bill for each single work or object. The Committee were of the opinion that this would adequately protect the budget system and yet keep it free from executive abuse."

A mere reading of Ch. 142 in the light of the purpose and intent of § 52 of Art. III of the Maryland Constitution, explained by the report of the framers of that section (which was adopted in 1916 by the voters of Maryland), can leave no doubt that the 1967 enactment is a textbook example of a clear and conspicuous violation of the proscriptions and limitations of the 1916 amendment. This Court had no choice, no alternative, but to declare this obvious fact. Section 52 (8) spells out that no appropriation other than that effected by the Budget Bill shall be valid unless it is "embodied in a *separate bill* limited to some single work, object or purpose *therein stated* and called herein a Supplementary Appropriation Bill" which shall provide the revenue necessary to pay the appropriation thereby made [by] a tax, direct or indirect, to be levied and collected as shall be directed in said bill." (Emphasis supplied.)

Chapter 142 does not state "therein" any limited "single work, object or purpose." It is an omnibus bill. In § 1 it establishes a "State Aid for Police Protection Fund" to be paid from the general funds of the State to provide more adequate police protection in the political subdivisions. The amounts given the towns and counties varied markedly. For example, Baltimore

2. Much of the history and of the purpose and effect of the Budget Amendment is also set forth in *McKeldin v. Steedman*, 203 Md. 89, 96-101.

City was given for one year a special grant of $5,000,000 over and above its share under the formula generally used, or more than 60% of the total funds granted for that year, although the City has only some 40% of the population of the State. Queen Anne's County has some 20,000 citizens, or about 2% of the population of Baltimore City. Its grant for police protection was to be less than one-tenth of 1% of the allocation to Baltimore City.

Chapter 142 also changed the laws relating to public education, especially as to teachers' salaries and pensions and the source and distribution of funds. It also created a school building construction aid program in which the State contributes up to eighty per cent of the cost. Under the formula of the bill Baltimore City was to receive about 12% of the total State allocation and Queen Anne's County 2%. Calvert County, with a population less than that of Queen Anne's, was to receive about two times the distribution for Queen Anne's.

Chapter 142 also made general unrestricted grants to political subdivisions.

Clearly, Ch. 142 combines in one bill at least three separate works, objects or purposes and the variances in the grants suggest that typical opportunities for "logrolling" and "back scratching" were present and significant in its passage.

The Attorney General's answer is to say that the single object and purpose of Ch. 142 is "financial aid to subdivisions." First, no attempt was made to state such a single purpose, either in the title or the body of House Bill 378 which became Ch. 142. Second, if "financial aid to subdivisions" could be held to be a single purpose, the proscriptions, restrictions and limitations of § 52 (8) on the matter would become meaningless and empty, especially in light of the evils that section was designed to prevent.

The "single purpose" requirements were written into a number of State Constitutions after Maryland adopted them in 1916. The courts in several of these States have taken the same view of the meaning of these requirements that we do. In *State, ex rel. Jensen v. Kelly* (S. D.), 274 N. W. 319, a bill made appropriations for the State Liquor Control Commission and the State Department of Justice and Public Safety, both of which

were agencies charged with the enforcement of the Liquor Control Act in which were embodied the challenged appropriations. The Court said (p. 323 of 274 N. W.) :

> "To uphold a special appropriation bill providing funds for separate and distinct departments, institutions, or agencies of the state government is to permit the objectionable practice at which the constitutional provision under consideration is directed."

See also Cottrell v. Faubus (Ark.), 347 S. W. 2d 52; In re House Bill 168 (Colo.), 39 Pac. 1096; McCombs v. Dallas County (Tex. Civ. App.), 136 S. W. 2d 975.

The Attorney General argued to us that a Supplemental Appropriation Bill is not covered by the provisions of § 29 of Art. III of the Constitution that every law shall embrace but one subject which must be described in its title to prevent the combination in one act of several and distinct incongruous subjects and to require that those interested be fairly appraised of the real nature of the pending legislation. Alternatively, he went on to argue that in any event the title of House Bill 378 met the tests of § 29 of Art. III. The suggested result of his arguments was that if Ch. 142 met the tests of § 29 it met the tests of § 52 (8) (a).

We shall assume without deciding that § 29 of Art. III applies to Supplemental Appropriations Bills, since we agree with the Attorney General that if it does House Bill 378 embraced but one subject, as that phrase has been construed and interpreted by this Court, which is adequately described in its title. The meaning of the words "one subject" as used in § 29 is much broader, we think, than the meaning of the words "some single work, object or purpose" as used in § 52 (8) (a). As long ago as 1879, our predecessors said in Baltimore v. Reitz, 50 Md. 574, 579, that "if several sections of the law refer to and are germane to the same subject-matter, which is described in its title, it is considered as embracing but a single subject, and as satisfying the requirements of the Constitution in this respect." This construction has been reiterated and reaffirmed many times. See Everstine, "Titles of Legislative Acts," 9 Md. L. Rev. 196, 205; Allied American Co. v. Commissioner of Motor

*Vehicles,* 219 Md. 607, 614; *Beshore v. Town of Bel Air,* 237 Md. 398, 412.

We find no incongruity in giving the "single object" requisites of § 52 (8) (a) a much more restricted meaning than the "one subject" requirement of § 29. The construction and effect of § 29 which we have just discussed had long been established when the framers proposed and the voters ratified the single object doctrine of § 52 (8). If it had been intended that § 52 (8) was to mean what § 29 had been held and was generally understood to mean, certainly the same words of § 29 that already had been construed would have been repeated in § 52. They were not, and other words were substituted to insure, we believe in light of the evil to be corrected and the result sought, that § 52 (8) would be given a much narrower and more restricted meaning than had been given § 29.

In similar situations Courts have found that the word "object" was to be equated with the word "purpose" and was to be given a more restricted meaning than the word "subject." See *State, ex rel. Jensen v. Kelly, supra* at p. 323 of 274 N. W.; *Fahey v. State* (Tex.), 11 S. W. 108; *People v. Lawrence* (N. Y.), 36 Barber 192; *cf. In re House Bill 168, supra* at p. 1098 of 39 Pac.

We conclude that the single subject described in the title of House Bill 378 (Ch. 142) as "increased financial aid by the State to local subdivisions" would gratify § 29 although it would affront § 52 (8) (a).

Finally, the Attorney General suggests that if Ch. 142 is held to violate the single object or purpose restrictions of § 52 (8) (a), the many appropriation bills since 1916 that have authorized the creation of a debt of the State for the purpose of raising funds to pay for the construction or improvement of a number of disparate buildings or projects of the State of different kinds and at different locations might be made suspect. It is suggested that *McKeldin v. Steedman,* 203 Md. 89, to which we referred earlier, approved Ch. 780 of the Laws of 1953, a bond bill which "could not endure under a strict construction of the most restrictive of the words in the phrase 'limited to some single work, object or purpose' as used in § 52 (8)." The *Steedman* case, agreeing with the parties that a bond bill is a Sup-

plementary Appropriation Bill, held only that one section of Ch. 780, directing the use of general funds as the primary source of payment of interest and principal of the bonds to be issued, violated the requirement of § 52 (8) (b) that "each Supplementary Appropriation Bill shall provide the revenue necessary to pay the appropriation thereby made [by] a tax, direct or indirect, to be levied or collected as shall be directed in said bill."

The meaning and effect of the restriction of § 52 (8) (a) of "a separate bill limited to some single work, object or purpose therein stated" was not brought into question in relation to Ch. 780 by the pleadings, was not argued in the briefs, and was not discussed or decided by the court.

We think the creation of a State debt in a specified amount in the manner prescribed in § 34 of Art. III by a Supplemental Appropriation Bill gratifies the dictates of § 52 (8) (a) even though the cash which is to result is directed to be used for multiple purposes. In 1916, as now, § 34 provided that "No debt shall be hereafter contracted by the General Assembly unless such debt shall be authorized by a law providing for the collection of an annual tax or taxes sufficient to pay the interest on such debt as it falls due, and also to discharge the principal thereof within fifteen years from the time of contracting the same * * *." The word "debt" is often used in the singular as "a debt." Webster's Third New International Dictionary defines "debt" as often applying "to a single definite amount of money owed." In the part of § 34 quoted above "debt" appears to have been thought of in this sense. The "single definite amount of money" to be raised and owed by the State is to be authorized by "a" law. In 1916 § 34, as far as State debt was concerned, was in effect a preexisting version of the later § 52 (8) (a).

Support for this reading of § 34 is offered by various provisions of § 52. The Goodnow commission which drafted the Budget Amendment did not in its report complain of the evils of debt creation—except as to the previous undue resort to it —or of bond bills. The report (*The Maryland Budget Amendment, supra*, p. 13) said: "Out of abundant caution and in order to carry out the purposes of the platform to protect the 'State's outstanding obligations,' we have left it in the power

of the Legislature to pass at any time and in the usual manner *an Appropriation Bill* for the payment of all the State's obligations protected by the provision of the Constitution of the United States * * *." (Emphasis added.) Paragraph 9 of § 52 is the provision referred to by the commission. Paragraph 14 of § 52 directs that in the event of inconsistency § 52 shall prevail over other parts of the Constitution but goes on to say: "But nothing herein shall in any manner affect the provisions of § 34 of Article 3 of the Constitution or of any laws * * * passed in pursuance thereof."

We think § 52 recognized that § 34 contemplated that a bill which created a debt of the State and provided for the payment of the interest and principal as specified was a separate appropriation bill, a single package, which, in the later words of § 52 (8) (a), stated therein the "single work, object or purpose" —the obtention of funds for State purposes from lenders—to which it was limited. Section 52 not only recognized this construction, it perpetuated it.

*Steedman,* as has been noted, while recognizing that a bond bill is a Supplementary Appropriation Bill, did not decide or consider whether the appropriation bill under attack in the case met the single purpose requirements of § 52. Counsel for the appellees were the lawyers, able and experienced, who had been employed to approve the bonds to be issued under the bill before the court. The Attorney General represented the State officials charged with duty of issuing the bonds. The opinion was written in 1953 by Chief Judge Sobeloff who had been chairman of the Commission on Administrative Organization of the State which in its 1952 report dealt exhaustively with the Budget Amendment and the practice under it, as indeed did the opinion. Judge Henderson, who for many years had been Deputy Attorney General, and Judge Hammond, who twice had served as Attorney General, concurred in the opinion. The silence of bond counsel, the Attorney General and the members of the Court on the matter of single purpose—Ch. 780 authorized a State debt of $15,040,950 to be disbursed for building or improving penal institutions, State parks, mental institutions, training schools, and educational institutions—can only be considered to have meant a general understanding and acceptance that § 52 (8) (a) had not been affronted by Ch. 780.

Significant is the fact that the bond bills enacted just before the Budget Amendment took effect were substantially the same in form and content as those enacted soon after. Chapter 791 of the Laws of 1914 created a "State Omnibus Loan" in the amount of $950,000 to complete the Maryland State Normal School, various armories, four State hospitals and Rosewood Training School. Chapter 681 of the Laws of 1916, signed by Governor Harrington under whose aegis the Budget Amendment was proposed and adopted, authorized a debt of $3,000,000, of which $2,700,000 was to pay for completion and maintenance of State roads ($540,000 in Baltimore City and $2,160,000 in the counties) and the balance for a building at College Park and three armories. Chapter 3 of the Extraordinary Session of 1917 created a State debt of $1,000,000, the proceeds of which were to go to the Maryland Council of Defense, the National Guard, to aid the political subdivisions in providing voting by mail, to acquire State farms at various institutions, assist the unemployed, construct a fish hatchery and stimulate the production of food and dairy products. Chapter 298 of the Laws of 1918, signed by Governor Harrington—Albert C. Ritchie was Attorney General—authorized a State debt of $1,000,000 to redeem and pay the certificates of indebtedness issued under Ch. 3 of the Laws of 1917. Chapter 727 of the Laws of 1920 created a State debt of $1,500,000 for a heating plant at Spring Grove Hospital, a barn at Springfield Hospital, a sewage plant at Crownsville Hospital, construction of a tuberculosis sanitarium, improvements at various State schools, construction of a War Memorial, a State Tobacco Warehouse and a bridge over the Severn River. The bonds were issued in 1921 when Albert C. Ritchie had passed from Attorney General to Governor. Attorney General Armstrong advised the State Treasurer on February 11, 1921, that "The said Act of Assembly [Ch. 727] is valid and constitutional." (Unreported opinion of the Attorney General)

We are firmly of the view that the framers of the Budget Amendment regarded the creation of a State debt by a Supplementary Appropriation Bill which conformed to the provisions of § 34 of Art. III of the Constitution as in conformity with the requirements of § 52 (8) (a) of Art. III and that if

516

the framers had chosen to illumine their report and recommendation with a classic example of the evils to be cured by the single purpose prescription they might well have thought of and used as such an example the conglomerate that is Ch. 142 of the Laws of 1967—with much smaller numbers of course.

Since Ch. 142 was not a valid Supplementary Appropriation Bill, no money could be validly drawn from the Treasury of the State by virtue of it under § 32 of Art. III of the Constitution, and we do not reach the question of whether if it had otherwise been valid as a Supplementary Appropriation Bill its language could have been read to have made an appropriation or appropriations.

In holding on June 14 last that Ch. 142 was prima facie valid as legislation we gave recognition to the general presumption in favor of the validity of a statute. The claim of the appellants was only that Ch. 142 was invalid and ineffective as a Supplementary Appropriation Bill and this opinion deals only with that claim and does not decide any other possible challenges to Ch. 142 since none was raised or decided below or briefed or argued in this Court.