568 A.2d 1111

**PORTEN SULLIVAN CORPORATION et al.**

v.

**STATE of Maryland et al.**

**No. 93, Sept. Term, 1989.**

Court of Appeals of Maryland.

Feb. 6, 1990.

M. Albert Figinski (Kathleen McDermott, Weinberg and Green, on brief), Baltimore, for petitioners.

Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union Fund of the Nat. Capital Area, Washington, D.C., Fred R. Joseph, Joseph, Greenwald & Laake, Greenbelt, amicus curiae for American Civil Liberties Union of Nat. Capital Area and Prince George's County Chapter of ACLU.

Robert A. Zarnoch, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Kathryn M. Rowe, Carmen Shepard, Asst. Attys. Gen., on brief), Annapolis, Roger D. Redden (Kurt J. Fischer, Piper & Marbury, Baltimore, Ronald D. Schiff, General Counsel to Maryland–National Capital Park and Planning Com'n, Hyattsville, Michael P. Whalen, County

Atty., Bruce L. Marcus, Sp. Counsel and Michael O. Connaughton, Deputy County Atty., Upper Marlboro, Walter H. Maloney, Beltsville, on briefs), for respondents.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE and ADKINS, JJ., and CHARLES E. ORTH, Jr., Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

ADKINS, Judge.

Among the several provisions of Article III, § 29 of the Maryland Constitution is the declaration that "every Law enacted by the General Assembly shall embrace but one subject, and that shall be described in its title." This case involves the "one-subject" mandate. We shall hold that Chapter 244, Acts of 1989, violates that constitutional command. We shall further hold that the measure's "ethics" provisions are severable from its "tax" provisions and that the latter survive the constitutionally required demise of the former.

## I.

Chapter 244 is an emergency measure that became effective 5 May 1989. Its legislative beginnings were modest: HB 889, designed to extend the life of a Prince George's County energy tax, and HB 890, intended to do the same for a special transfer tax in Prince George's County. In the Senate, however, the two uncomplicated and brief tax measures found themselves embodied in a greatly-amended version of HB 890 that also enacted extensive ethical regulations pertaining to the Prince George's County Council. It was only after this metamorphosis that HB 890 became Chapter 244.

Section 1 of the Act (as printed in the session laws) consists of some four and one-half pages. Most of the first four pages contain what we shall designate the "ethics" portion of the statute. That portion chiefly adds a new subtitle 6 to Title 6 of Article 40A of the Maryland Code—

the Public Ethics Law. Subtitle 6 is applicable only in Prince George's County, but within that geographical area, its provisions are far-reaching.

Subtitle 6 focuses on "applications." Section 6–601(d) tells us that

"Application" means application for:

(1) A special exception or variance to a provision of a zoning regulation or ordinance;

(2) An amendment to a zoning regulation or ordinance;

(3) Approval of a site plan; or

(4) An amendment to a master plan.

Obviously, an "application" is made by an "applicant." Section 6–601(c)(1) defines that word as

(i) A title owner, contract purchaser, or lessee of land that is the subject of an application;

(ii) A trustee that has an interest in land that is the subject of an application [with certain exceptions]; or

(iii) A holder of any interest in a business entity that has an interest in land that is the subject of an application.

Moreover,

(2) "Applicant" includes:

(i) The spouse or children of an applicant; or

(ii) Any corporation, partnership, limited partnership, joint venture, or other business organization in which a person or entity, as defined under paragraph (1) of this subsection, holds an interest.

With these definitions in mind, we proceed to the heart of subtitle 6, § 6–603:

(a) During the 36–month period before the filing of an application, and during the pendency of an application, if a member of the County Council receives money, goods,

or services from an applicant or [a broadly defined] agent of an applicant,[1] the County Council member:

(1) Shall make a full public disclosure in writing of the money, goods, or services before any proceeding on the application; and

(2) May not vote or participate in any way in the proceeding on the application.

(b)(1) At the time an application is filed, the applicant shall file an affidavit, under oath, that:

(i) Discloses the name of any member of the County Council whose candidacy the applicant has promoted during the 36–month period preceding the filing of the application; or

(ii) States that the applicant has not promoted the candidacy of any member of the County Council during the 36–month period.

(2) If the applicant promotes the candidacy of any member of the County Council during the time that the application is pending, the applicant shall file an amended affidavit disclosing the name of the member or members whose candidacy was promoted.

(3) At any time after an application is filed, any agent who has knowledge of any application that has been filed in which the agent has promoted the candidacy of any member of the County Council during the 36–month period preceding the filing of the application, shall file an affidavit, under oath, that discloses the name of the member of the County Council that the agent has promoted.[2]

---

**1.** Although Chapter 244 contains no exemption for contributions to multi-candidate slates that include a councilmember or to a councilmember through political action committees, the Attorney General has suggested that contributions of this sort are not covered by the Act. Letter of Advice from Asst. Atty. Gen. Robert A. Zarnoch to Senator Thomas P. O'Reilly, 17 Apr. 1989. *See infra* note 7.

**2.** In connection with the applicant disclosure provisions of subsection (b), the State Ethics Commission has advised that these requirements apply only to contributions made by any officer, director, or share-

Various enforcement mechanisms are provided in addition to councilmanic disqualification and both councilmanic and applicant disclosure. Section 6–604(a)(1) allows the State Ethics Commission to seek court-enforced compliance. Section 6–604(b) makes violation of subtitle 6 a misdemeanor. Section 6–604(a)(2) purports to authorize judicial abrogation of County Council action taken "in violation of this subtitle ... if the court deems voiding the action to be in the best interest of the public." [3] The remaining half page of Section 1, plus some ten lines earlier on, contain the "tax" provisions which the title describes as

> extending the termination date applicable to a certain increase in the maximum allowable transfer tax in Prince George's County [and] extending the termination date for the Prince George's County energy tax.

Three additional sections of the Act make the "ethics" provisions prospective only; authorize use of the transfer tax proceeds to fund the "ethics" provision; and declare the Act to be an emergency measure. The Act's short title proclaims the measure to be

> AN ACT concerning
>
> Prince George's County Council—Ethics and Taxing Authority.

---

holder of a corporate applicant who holds more than 5 percent of the corporation's stock, and only to the applicant's agents and employees who are significantly involved in the affected project. State Ethics Commission Opinion 89–7 (20 June 1989). No such express limitations appear in the statute. The Ethics Commission also has suggested that "passive" political activity—for example, the promotion of a candidacy through bumper stickers or yard signs—is not included within that sort of "promotion" that triggers disclosure. State Ethics Commission Memorandum of 21 June 1989. Section 6–601(g), however, broadly defines "promoted" as "to have contributed money, goods, or services to a member of the County Council, or to have requested, urged, or encouraged others to contribute money, goods, or services to a member of the County Council." There is no express exclusion of "passive" promotion.

3. Appellants assert that this standard for judicial action is essentially a legislative one and hence violates the separation of powers mandated by Article 8 of the Maryland Declaration of Rights. We note that the language is copied from § 7–101(1) of Article 40A—a part of the Public Ethics Law that to date has not been considered in any reported opinion of this Court or the Court of Special Appeals.

As we have seen, Chapter 244 began its legislative life in considerably less comprehensive form. House Bills 889 and 890, the seeds that ultimately flowered into this sweeping enactment, were sponsored by the Prince George's County delegation, introduced on 2 February 1989, and referred to the Ways and Means Committee.

A Prince George's County energy tax, originally authorized by Chapter 700, Acts of 1987, was due to expire on 30 June 1989. House Bill 889 would have extended the authorization for that tax. A fiscal note pertaining to HB 889 indicates that "Prince George's County revenues will be reduced by $24.7 million beginning in FY 90" should the bill not be enacted. The revenue from the energy tax was devoted to the funding of public education.

House Bill 890, in its introductory form, proposed to repeal the termination date of a .5 percent increase in the transfer tax in Prince George's County. The transfer tax increase from 1 percent to 1.5 percent had been authorized by Chapter 151, Acts of 1984, but was to expire (by virtue of a previous extension granted by Chapter 538, Acts of 1987) on 1 July 1989. According to a letter from the Prince George's County Executive and the chairwoman of the County Council to Prince George's legislators, an additional five years with the .5 percent increase would generate $70 million. Loss of that revenue would adversely affect education and public safety in the county, those two budgetary areas making up about 70 percent of the county budget. A fiscal note on HB 890 estimated that if the extra .5 percent remained in effect during FY 1990, the County would receive $13.4 million in revenues—revenues that would otherwise be lost.

With the support of the Prince George's County government as well as its House delegation, HBs 889 and 890 received favorable reports, with minor amendments, in the Ways and Means Committee. They passed the House of

Delegates on 6 March 1989, by a vote of 116–1. On the following day they arrived in the Senate and were referred to the Budget and Taxation Committee.

While HBs 889 and 890 were moving through the House, so was HB 891. This bill also was sponsored by the Prince George's County delegation. It would have authorized the county, "by ordinance, to impose and provide for the collection of development impact fees for financing, in whole or in part, the capital costs of additional or expanded transportation projects required to accommodate new construction or development." A fiscal note estimated "$2.5 to $3 million annually in new revenues from the imposition of impact fees." House Bill 891 emerged from the Constitutional and Administrative Law Committee and passed the House of Delegates on 22 March. In the Senate it was referred to the Finance Committee.

During the week that HB 891 passed the House, newspapers reported that Walter H. Maloney, Esquire, a Prince George's County lawyer (and now an appellee in this case), had attempted to disqualify five members of the Prince George's County Council from voting on a zoning application. Maloney claimed that the applicant had been successful before the Council because it had donated $7,950 to Councilmembers. This situation seems to have attracted the attention of Prince George's County Senators, for Senator Komenda, Chairman of the County's Senate delegation, requested that committee action on HBs 889, 890, and 891 be deferred.

On 30 March Maloney appeared before the County Senators and explained his concerns about the conflict of interest problem. He also outlined sweeping proposed legislation that would require the sort of disclosure and councilmanic disqualification eventually incorporated in Chapter 244. The County Senators decided to support extension of the energy tax for one year and the transfer tax increase for one year. This was to be done via HB 890, to which Maloney's proposed "ethics" provisions were to be added. House Bills 889 and 890 were rereferred to the County

Senators. House Bill 890 was amended as proposed by those Senators. House Bills 889 and 891 died.

What had been essentially a one-page bill concerning "Prince George's County—Transfer Tax" was now transmogrified into lengthy emergency legislation extending to "Prince George's County Council—Ethics and Taxing Authority." In that form, HB 890 passed the Senate on 6 April 1989, after suspension of the rules.

On 8 April, with but two days remaining in the 1989 session, a divided Prince George's County House delegation endorsed the bill. It passed the House on 10 April, the last day of the 1989 session, and thus became Chapter 244.[4]

## II.

The "ethics" component of Chapter 244 soon came to the attention of developers operating in Prince George's County. Appellant Porten Sullivan Corporation (Porten Sullivan) is a Maryland corporation which sometimes is involved in zoning matters in Prince George's County. On 26 July 1989 (later joined by one of its employees, a resident of the County), it sued appellees, the State of Maryland (the State), Prince George's County (the County), and various others. The complaint alleged that Chapter 244 violated the first amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights in numerous ways; the equal protection guarantees of the fourteenth amendment and Article 24 of the Maryland Declaration of Rights; Article III, § 29 of the Maryland Constitution; the Home Rule Amendment of Article XI–A of the Maryland Constitution; and the separation of powers required by Article 8 of the Declaration of Rights. Appellee Walter Maloney, a citizen, resident, taxpayer, and property owner in Prince George's County, was permitted to intervene as a defendant.

---

4. Our summary of the evolution of the bills that eventually became Chapter 244 is based in large part on the parties' "Stipulation No. 2—Legislative History of HB 890."

After answers and cross-motions for summary judgment had been filed, the Circuit Court for Prince George's County upheld Chapter 244 in all respects, denied all relief to Porten Sullivan and its employee, and granted the defendants' motions for summary judgment. We granted Porten Sullivan's petition for certiorari before any proceedings were had in the Court of Special Appeals and now reverse.

### III.

### A.

As we have indicated, we base our decision on the one-subject requirement included in Article III, § 29 of the Maryland Constitution. As to that, Porten Sullivan's position is straightforward. The "tax" measures have been treated as subjects of separate legislation in the past. The "tax" provisions now contained in Chapter 244 have nothing to do with development control or ethics. They are revenue measures the proceeds of which have been used to fund education, drug programs, and other needs of Prince George's County. The special "ethics" portions of Chapter 244 have nothing to do with taxation or revenue raising. "It is simple sophistry to join, as one subject, ethics and taxing authority." Brief for Appellant Porten Sullivan at 46.

The State responds that the subject here is the management of public affairs in Prince George's County. Moreover, it avers, measures like the transfer tax and the impact fees were opposed by developers because they discouraged growth. They were supported by anti-growth citizens' groups. The ultimate package was a compromise designed to address the general problem of development in Prince George's County, through stringent ethics provisions combined with some revenue measures, but not the anti-growth impact fee.

The County presents a variation on this theme, contending that the single subject of Chapter 244 is "the functions and duties of the Prince George's County Council." The

Act is not invalid, the County contends, merely "because it combines tax measures with an ethics program which may be funded with the proceeds of those taxes."

Maloney views the Act as a zoning reform measure to which a couple of tax provisions have been appended. Like the State, he insists that the single subject of the Act is "the management of public affairs in Prince George's County, whether such affairs include taxes, zoning, or ethical behavior on the part of public officials."

We must review these contentions in light of the history of Article III, § 29, and our cases construing it. We also look to the construction of similar provisions in the Constitutions of our sister states.

### B.

The "one-subject" restriction of § 29 entered our Constitution in 1851, but perusal of the debates of the 1851 Constitutional Convention reveals little about the purpose of the provision. The one-subject requirement was included, with other language, in an amendment proposed by Mr. Stewart of Caroline County. 1 *Debates and Proceedings of the Maryland Reform Convention to Revise the State Constitution* 305 (1851). Mr. Stewart explained that "[i]n Louisiana, every law embraced one subject, and the object of the law was expressed in the title page." *Id.* at 312. But the discussion of his amendment centered on other aspects, particularly portions that, it was thought, would promote ease of access to the laws and reduction of confusion caused by lack of codification. *Id.* at 314.

We learn little more from the proceedings of the 1864 and 1867 conventions. At each of them, the one-subject rule was included in the recommendations of the Committee on the Legislative Department (and in the Constitution eventually adopted) but at neither of them was it discussed. 1 *The Debates of the Constitutional Convention of the State of Maryland* 474 (Bayly 1864); *Proceedings of the State Convention of Maryland to Frame a New Constitution*

107 (Colton 1867). The 1967 Constitutional Convention Commission Report sheds a bit more light on the matter. Although the constitution drafted by the Constitutional Convention Commission (and in substance adopted by the Convention) was not ratified by the voters, § 3.15 of the draft document included the requirement that "[e]very law enacted by the General Assembly shall embrace only one subject, which shall be described in its title." The Commission believed

> that the reasons for requiring a single subject and a descriptive title are still valid and that the requirement is desirable. The absence of such a provision might in some instances make it necessary for a legislator to acquiesce in an undesirable bill in order to secure useful and necessary legislation.

*Report of the Constitutional Convention Commission* 141 (1967).

One reason for the relatively limited discussion, in Maryland constitutional history, of the reasons for the single-subject rule may be that it is one that has been applied for centuries. During Roman times, there was a prohibition against proposing laws that contained more than one subject. Corwin, *The "Higher Law" Background of American Constitution Law,* 42 Harv.L.Rev. 149, 160 n. 36 (1928); Ruud, *"No Law Shall Embrace More Than One Subject,"* 42 Minn.L.Rev. 389, 389 (1958).

Illinois was the first American state to deal with the problem of omnibus bills through constitutional means. In 1818, it adopted a constitutional provision which "limited bills appropriating salaries for members of the legislature and for officers of the government to that subject." Ruud, *supra,* at 389. Michigan was next to address the single-subject rule. In 1843, it "adopted a constitutional amendment limiting laws authorizing the borrowing of money or the issuance of state stock to a single object." *Id.* at 390. In 1844, New Jersey became the first state to have a general constitutional provision addressing the one-subject rule. *Id.*

As of 1982, "forty-one state constitutions provide[d] that an act shall not embrace more than one subject or object." *Sutherland Statutory Construction* § 17.01 (4th ed. 1985). Many states recognize that a purpose of the one-subject rule is "to prevent 'riders' from being attached to bills that are popular and so certain of adoption that the rider will secure adoption not on its own merits, but on the merits of the measure to which it is attached." Ruud, *supra*, at 391. *See, e.g., Gellert v. State,* 522 P.2d 1120, 1122 (Ala.1974) (purpose of one-subject requirement is to prevent logrolling); *Floridians Against Casino Takeover v. Let's Help,* 363 So.2d 337, 339 (Fla.1978) (single-subject rule allows people to express separate approval or disapproval of statutory sections); *Kane County v. Carlson,* 116 Ill.2d 186, 214, 107 Ill.Dec. 569, 580, 507 N.E.2d 482, 493 (1987) (purpose of rule is to prohibit combining of provisions which on their own may not have enough support to pass); *Jackson v. State,* 194 Ind. 248, 252, 142 N.E. 423, 424 (1924) (purpose of single-subject provision includes preventing passage of law based on strength of unrelated measure); *Garten Enterprises, Inc. v. Kansas City,* 219 Kan. 620, 622, 549 P.2d 864, 867 (1976) (single-subject requirement prevents "a matter of legislative merit from being tied to an unwanted matter ..., and [promotes] the lessening of improper influences which may result from intermixing objects of legislation in the same act which have no relation to each other"); *Shrout v. Rinker,* 148 Kan. 820, 822, 84 P.2d 974, 976 (1938) (single-subject provision prevents "two or more unrelated subjects being covered in an act[,] so that members of the legislature [do not] feel that they should vote for a bill which contain[s] a provision to which they [are] opposed in order to secure the enactment of the bill with some provisions they consider[ ] important"); *State v. Dooley,* 261 La. 295, 308, 259 So.2d 329, 333 (1972) (one purpose of single-subject rule is "so that a legislator will not for the purpose of voting on the bill have to weigh the validity of two objects foreign to each other"); *Kelly v. Williams,* 346

S.W.2d 434, 436 (Tex.Civ.App.1961) (prevention of "riders" is recognized purpose of Texas one-subject rule).

An additional purpose of the single-subject rule is to "protect the integrity of the governor's veto power." Williams, *State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement,* 48 U.Pitt.L.Rev. 797, 809 (1987). In *Brown v. Firestone,* the Supreme Court of Florida said that a purpose of the one-subject rule is to prevent

> "a practice under which the legislature could include in a single act matters important to the people and desired by the Governor and other matters opposed by the Governor or harmful to the welfare of the state, with the result that in order to obtain the constructive or desired matter the Governor had to accept the unwanted portion. The veto power of the chief executive [would] thereby [be] severely limited if not destroyed and one of the intended checks on the authority of the legislature [would be] able to be negated in practice."

382 So.2d 654, 663–664 (Fla.1980) (quoting *Green v. Rawls,* 122 So.2d 10, 13 (Fla.1960)). *See House Bill No. 1353,* 738 P.2d 371, 372 (Colo.1987) (single-subject rule "enables governor to consider each single subject of legislation separately and independently in determining whether to exercise his veto power"); *Turner v. Wright,* 11 Ill.2d 161, 172, 142 N.E.2d 84, 90 (1957) ("by limiting the contents of a bill to a single subject it outlaws legislative 'riders,' and so protects the veto power of the Governor against encroachment"); *Commonwealth v. Barnett,* 199 Pa. 161, 171–172, 48 A. 976, 977 (1901) ("by joining a number of different subjects in one bill the governor was put under compulsion to accept some enactments that he could not approve, or to defeat the whole, including others that he thought desirable or even necessary"). The California Supreme Court has said that although it has not yet recognized any relationship between the one-subject rule and the governor's veto power, "it cannot be denied that as a practical matter the broader the definition ascribed to the term 'single subject' . . ., the more

circumscribed is the Governor's power to veto legislation." *Harbor v. Deukmejian*, 43 Cal.3d 1078, 1094, 240 Cal.Rptr. 569, 577–578, 742 P.2d 1290, 1298–1299 (1987).

Like the courts of our sister states, this Court has explored the purpose of the single-subject provision of the Maryland Constitution. Our predecessors first discussed it in *Davis v. State*, 7 Md. 151 (1854). The case involved Chapter 200, Acts of 1854, and the rights of an inspector of ground black-oak bark. The Court held that the statute did not violate that portion of what was then Article III, § 17, which read: "Every law enacted by the legislature shall embrace but one subject, and that shall be described by the title." To the Court, the

> object of this constitutional provision is obvious and highly commendable. A practice had crept into our system of legislation, of engrafting, upon subjects of great public benefit and importance, for local or selfish purposes, foreign and often pernicious matters, and rather than endanger the main subject, or for the purpose of securing new strength for it, members were often induced to sanction and actually vote for such provisions, which if they were offered as independent subjects, would never have received their support. In this way the people of our State, have been frequently inflicted with evil and injurious legislation. Besides, foreign matter has often been stealthily incorporated into a law, during the haste and confusion always incident upon the close of the sessions of all legislative bodies, and it has not infrequently happened, that in this way the statute books have shown the existence of enactments, that few of the members of the legislature knew anything of before. To remedy such and similar evils, was this provision inserted into the constitution, and we think wisely inserted.

*Davis*, 7 Md. at 160.

Through the years we have consistently recognized these goals. *See, e.g., Parkinson v. State*, 14 Md. 184 (1859); *County Comm'rs v. Meekins*, 50 Md. 28 (1878); *Neuenschwander v. Wash. San. Com.*, 187 Md. 67, 48 A.2d 593

(1946); *Clinton Vol. Fire Dep't v. Board,* 259 Md. 456, 270 A.2d 778 (1970); *Whiting–Turner Contract. Co. v. Coupard,* 304 Md. 340, 499 A.2d 178 (1985). It must be recognized, however, that the phrase in question has more than one objective. The one-subject clause is intended " 'to prevent the combination in one act of several and distinct incongruous subjects....' " *Whiting–Turner,* 304 Md. at 361, 499 A.2d at 189 (quoting *Allied American Co. v. Comm'r,* 219 Md. 607, 614, 150 A.2d 421, 426 (1959)); *see also Curtis v. Mactier,* 115 Md. 386, 394, 80 A. 1066, 1069 (1911). The title clause is designed to "inform members of the legislature and the public about the [ ] nature" of the proposed legislation. *Ogrinz v. James,* 309 Md. 381, 398, 524 A.2d 77, 86 (1987) (citing *Equitable Life v. State Comm'n,* 290 Md. 333, 342, 430 A.2d 60, 65 (1981)). While these two goals are related, they can also be quite distinct.

In any case, the " 'general disposition of [this] Court has been to give the section a liberal construction, so as not to interfere with or impede legislative action.' " *Whiting–Turner,* 304 Md. at 361, 499 A.2d at 189 (quoting *Painter v. Mattfeldt,* 119 Md. 466, 473, 87 A. 413, 416 (1913)); *see* Everstine, *Titles of Legislative Acts,* 9 Md.L.Rev. 197, 201–204 (1948). Section 29's one-subject stricture is to be given a less restrictive meaning than "single work, object or purposes" as used in Article III, § 52(8)(a) (part of the 1916 Budget Amendment). *Panitz v. Comptroller,* 247 Md. 501, 512, 232 A.2d 891, 897 (1967). Indeed, only twice have we struck down a statute for a "single-subject" violation.[5] *See Scharf v. Tasker,* 73 Md. 378, 21 A. 56 (1891); *Curtis, supra. See also Harbor v. Deukmejian,* 43 Cal.3d at 1094, 240 Cal.Rptr. at 577–578, 742 P.2d at 1298–1299 (statute

---

**5.** In a third case, *Ellicott Machine Co. v. Speed,* 72 Md. 22, 18 A. 863 (1889), the Court considered an 1888 act which provided for the payment of wages to the employees of insolvent employers. The Court found that corporations were not covered by the statute, and further said that even if it found that the statute included corporations, it would have been struck down because it would have violated the one-subject rule.

held invalid for violating one-subject rule where provisions included such diverse subjects as fiscal impact report submission procedures and public disclosure of complaints filed against licensees); *House Bill No. 1353*, 738 P.2d at 372–373 (statute containing such "diverse and incongruous subjects" as charging for prisoners' medical visits and creating information management commission held invalid because violated one-subject rule). Despite this "general disposition" of deference to the legislature, however, the "single-subject" provision is still a part of our Constitution. As such, it is not to be treated as a dead letter, and we believe we must apply it to the statute now before us.

## C.

■ *Curtis v. Mactier, supra,* involved Chapter 382, Acts of 1910. Most of that statute dealt with the incorporation of the Village of Chevy Chase. It contained various provisions pertaining to the scheme of government of that municipality, and the duties and powers of its officials and agencies. One section, however, directed the County Commissioners of Montgomery County to "make a special levy" on certain property in Chevy Chase, and to pay over the proceeds to the treasurer of the Chevy Chase Improvement Association, to be used for certain purposes of the Village. 115 Md. at 390–391, 80 A. at 1067–1068. That special levy provision, the Court held, was fatal.

> It certainly requires no argument to demonstrate the proposition that the levying and appropriation of taxes by the County Commissioners in the manner indicated is a different subject from the incorporation of a village. The Act under consideration manifestly undertakes to legislate upon two wholly distinct subjects, under a title by which only one of those subjects is described. Even if the title had fully indicated both of the matters proposed to be covered by the Act, the situation would not have been improved, because this would nevertheless have been in

obvious violation of [the single-subject clause] of section 29 of Article 3 of the State Constitution.

115 Md. at 394, 80 A. at 1069.

The ethics legislation requiring the disqualification of Prince George's County Councilmembers as prescribed by Chapter 244 is similarly distinct from those portions of the Act that extend certain taxing authority for one year. The "ethics" provisions are unrelated to raising revenue for county government operations. Moreover, while the "tax" provisions are grants of authority to the County Council, the "ethics" provisions are not. Except for minor details about filing affidavits and reports by the Council's clerk, the "ethics" portion of the Act does not deal with authority or discretionary activity by the Council; it simply imposes the "ethics" requirements on that body as well as on applicants (as defined in the Act), their agents, spouses, and children.

This legislation does not deal, in any general way, with the County Council. It contains two unrelated and disparate sets of provisions, one imposing mandatory "ethical" requirements on Councilmembers and certain entities that appear before the Council in zoning matters; the other extending the Council's authority to impose certain taxes. The two disparate subjects are not transformed into one merely because there is authority in the Act to spend some of the tax revenues on "funding of the public ethics provisions," authority that to a considerable extent would have existed even without the language of Chapter 244. *See* Article 24, § 9–603(f)(2) as added by Chapter 244, Acts of 1989, and Section 3 of that statute. No one has been able to point to any particular county funding provision that requires money to be used for "ethics" measures. If any exists, it seems that it is *de minimis*.

The State, the County, and Maloney insist, however, that the Act deals generally with Prince George's County government, and that under the reasoning of *Meekins, supra,* it passes constitutional muster. They are wrong.

Chapter 160, Acts of 1878, was before the Court in *Meekins.* That 1878 legislation provided substantially for the structure of Dorchester County government, and it repealed all inconsistent laws. 50 Md. at 41. It divided the county into commissioner districts, provided for the election of commissioners, made the county treasurer a gubernatorial appointee, prescribed his duties (adding some new ones), and authorized the treasurer to appoint tax collectors. *Id.* at 41–42. A divided Court explained:

The several sections of the Act enact a system for levying and collecting the taxes in the county, and for disbursing the public money; and the duties of the County Commissioners, the Treasurer and the tax collectors are so closely connected and made so to depend each upon the other, that the execution of the system thus framed depends upon the faithful performance of their duties by the Commissioners, Treasurer and tax collectors. The *subject* of legislation was the management of the public affairs of Dorchester County by the County Commissioners and the other officers of that county....

*Id.* at 42 [emphasis in original].

 This simply cannot be said of Chapter 244. It does not provide broadly for the structure and organization of Prince George's County government, nor are the "tax" provisions and the "ethics" provisions "closely connected" or dependent upon each other. Nor, we might add, does its title suggest that the general structure and organization of Prince George's County are involved. *Meekins* is more like *State v. Fox,* 51 Md. 412 (1879), than it is like this case. In *Fox,* an act adding an entire article (Garrett County) to the Code of Public Laws was upheld against an Article III, § 29 challenge. Obviously, an article dealing with all the powers, duties, and functions of an entire county, with the close interrelationships demanded of its several provisions, is an appropriate single subject. But that is not the sort of legislation we have here.

Nor have we the sort of situation that was presented in *Madison Nat'l Bank v. Newrath,* 261 Md. 321, 275 A.2d 495

(1971). We there upheld the Uniform Commercial Code against a § 29 attack. On the topic of one subject, we said "the very nature of such uniform legislation ... is to provide comprehensive legislation in a given field." 261 Md. at 338, 275 A.2d at 504. We held that "[t]he U.C.C., extensive as it is, deals with but one general subject—commercial transactions—in its many related aspects." *Id.*, 275 A.2d at 504.

Once again, this cannot be said of Chapter 244. It does not deal with "many related aspects" of "comprehensive legislation in a given field." It deals with one aspect of County Council ethics (zoning-related ethics) and with limited taxing authority (energy and transfer taxes) that has no connection with zoning or with ethics, but has to do with raising revenue. It is specious, moreover, to contend that the subject of Chapter 244 is zoning or growth control. We note in passing that the Act's title does not refer to zoning in general or to growth control. Zoning, furthermore, involves much more than County Councilmember disqualification in some circumstances. And the disqualification provisions are strange ways to attempt to control growth, if that is what they are intended to do. In any case, the tax provisions do not appear to be designed to do anything except raise revenues. Any effect they may have on growth is not demonstrated by the record before us.

*Panitz v. Comptroller, supra,* is equally unavailing to sustain Chapter 244. The unifying theme of the legislation there was that it all involved " 'increased financial aid by the State to local subdivisions.' " 247 Md. at 512, 232 A.2d at 897. There is no such unifying theme here. And Chapter 244 is not like legislation that concerns only fire companies in Prince George's County. *Clinton Vol. Fire Dep't v. Board, supra.* As we have already pointed out, Chapter 244 implicates disparate and independent matters.

The cases we have discussed illustrate the difficulty of defining with precision when a measure contains "distinct and incongruous subjects." *Meekins* offers one criterion: a measure contains distinct subjects when there is "engrafted

upon a law of a *general* nature, some subject of a private or local character...." 50 Md. at 41 [emphasis in original]. That is not what we have here. *Meekins* also suggests the concepts of close connection and interdependence; *id.* See also, e.g., *Newrath, supra.* And as *Newrath, Meekins,* and *Fox,* all *supra,* suggest, notions of connection and interdependence may vary with the scope of the legislation involved. That is, a measure that begins life as a comprehensive one, and then has additional details inserted may survive a § 29 attack more readily than an originally narrow bill which becomes a very broad one. It is of some significance that the legislation involved in cases like *Clinton, Panitz, Newrath,* and *Meekins* was comprehensive at its outset; it was not vastly expanded by incongruous amendments.

█ Stated in a somewhat different way, an act meets both the "subject" and "title" requirements of § 29 if its "several sections refer to and are *germane* to the same subject-matter" and if that subject-matter is described in the title. *Baltimore v. Reitz,* 50 Md. 574, 579 (1879) [emphasis in original]. *See also, e.g., Equitable Life,* 290 Md. at 343, 430 A.2d at 66; *Clinton,* 259 Md. at 473, 270 A.2d at 787; *Panitz,* 247 Md. at 511, 232 A.2d at 897; *Neuenschwander,* 187 Md. at 77, 48 A.2d at 598; *Curtis,* 115 Md. at 393, 80 A. at 1068. The notion of germaneness is like those of connection and interdependence, for "germane" means "[i]n close relationship, appropriate, relative, pertinent." *Black's Law Dictionary* 618 (5th ed. 1979).

But at the end we come back to general statements: "to render a law obnoxious to the [one-subject] clause of Art. 3, sec. 29, of the Constitution ... two or more dissimilar and discordant subjects must be legislated upon in the same law." *Meekins,* 50 Md. at 41. And again "the object of this clause was to prevent the embodying into the same Act distinct and separate matters of legislation, having no connection whatever with each other." *Gans v. Carter,* 77 Md. 1, 10, 25 A. 663 (1893). Are the "ethics" and the "tax" provisions of Chapter 244 "distinct and incongruous" or

"distinct and separate?" This question ordinarily must be answered on a case-by-case basis, keeping in mind the reasons given to the single-subject rule:

1. To avoid the necessity for a legislator to acquiesce in a bill he or she opposes in order to secure useful and necessary legislation; to prevent the engrafting of foreign matter on a bill, which foreign matter might not be supported if offered independently. *See, e.g., Parkinson,* 14 Md. at 193; *Davis,* 7 Md. at 160; *Report of the Constitutional Convention Commission* 141 (1967);

2. To protect, on similar ground, a governor's veto power.

Chapter 244 is a textbook example of legislation designed to frustrate these purposes.

We recall that it began life as HBs 889 and 890, both intended to extend certain taxing authority of the Prince George's County Council. It was represented that the substantial revenues that these bills would engender were important to the County government. No doubt on the basis of these representations, those bills passed the House of Delegates.[6]

In the Senate, the "ethics" provisions were added. As we have already observed, they had nothing at all to do with the "tax" provisions. So what passed the Senate as HB 890—(or in effect, what was approved by the Prince George's Senators, *see* note 6, *supra*)—and what ultimately became Chapter 244 was a creature very different from that which had emerged from the House. Significantly, the Senators seem to have recognized the importance of the "tax" provisions; they were retained in only slightly modified form. Thus, when the drastically rewritten HB 890 returned to the House, the Prince George's delegates were faced with a difficult choice. Whatever merits the "ethics"

---

6. These bills were local bills in that they concerned only Prince George's County. Under the tradition of local courtesy, they would ordinarily pass the House (and Senate) if supported by legislators from that County. Department of Fiscal Services, 1 *Legislator's Handbook: The Maryland General Assembly* 53 (1986).

provisions may have—as to this, we express no view—delegates from Prince George's County might have opposed them. But if they did, an attempt to remove them from the bill, or even to modify them during the waning days of the 1989 legislative session, would have seriously jeopardized the "tax" provisions.

We do not know the actual position of the House delegation as to the "ethics" portion of HB 890. We do not need to know. What is important is that the delegates from Prince George's County were put in precisely the position from which the one-subject clause was intended to protect them: the necessity "for a legislator to acquiesce in [a possibly] undesirable bill in order to secure useful and necessary legislation." *Report of the Constitutional Convention Commission, supra.* The Governor would have been put in a similar position with respect to his veto power.

Since this Act, as it was shaped in the Senate, resulted in a measure that contravenes the policy underlying the one-subject clause, we hold that Chapter 244 does contain two distinct and incongruous subjects. It is unconstitutional because it violates § 29's mandate that "every Law enacted by the General Assembly shall embrace but one subject." [7]

## IV.

■ The only issue remaining before us is whether Chapter 244 must be voided *in toto*, or whether the "tax" and "ethics" provisions are severable.

---

**7.** Since we so hold, we need not consider any of Porten Sullivan's other contentions and we express no views as to any of them. Should the General Assembly consider new ethics legislation like that embodied in Chapter 244, we assume it will give consideration, as it deems appropriate, to the constitutional and other concerns debated in this litigation. We note that arguments to uphold the legislation depend to some degree on limiting interpretations adopted by the Attorney General and the State Ethics Commission. *See* Letter Approving of Constitutionality of HB 890 from Attorney General J. Joseph Curran, Jr. to Governor William Donald Schaefer, 3 May 1989; State Ethics Commission Opinion No. 89–7, 20 June 1989; State Ethics Commission—HB 890 Selected Questions and Answers, 21 June 1989. *See also* notes 1, 2, and 3, all *supra*.

■ There is a "strong presumption 'that a legislative body generally intends its enactments to be severed if possible.'" *State v. Burning Tree Club, Inc.*, 315 Md. 254, 297, 554 A.2d 366, 387 (1989) (quoting *O.C. Taxpayers v. Ocean City*, 280 Md. 585, 600, 375 A.2d 541, 550 (1977)). *See* Code, Art. 1, § 23. The focus is on legislative intent. *Burning Tree*, 315 Md. at 296–297, 554 A.2d at 387. The application of this rule in "single-subject" cases was explained in *Davis*, 7 Md. at 160–161:

We are not prepared to say, that a whole law, otherwise constitutional, would be rendered void by the introduction of a single foreign or irrelevant subject into it.... In such a case the irrelevant matter would be rejected as void, while the principal subject of the law would be supported, if properly described in the title. But if an Act of Assembly, be composed of a number of discordant and dissimilar subjects, so that no one could be clearly recognized as the controlling or principal one, the whole law would be void.

*See also Reitz*, 50 Md. at 579. And in *Curtis*, 115 Md. at 398, 80 A. at 1070, we added that "an entire act ought not to be stricken down because one or more provisions are void unless these are so connected together in subject-matter, meaning or purpose, that it can not be presumed the legislature would have passed the one without the other."

In *Curtis*, the entire act was invalidated "because it would be impossible to believe ... that if the act had been presented to the legislature with the features eliminated which we have held invalid it would have been passed by the legislature." *Id.* at 399, 80 A. at 1071. The opposite is true here. Had HBs 889 and 890 pursued their normal course, they likely would have passed the legislature. The tax extension provisions passed the House and they also passed the Senate, as embodied in the ultimate version of HB 890. The legislative history reveals that those measures were the original, true, and dominant subject of what eventually became Chapter 244. The "ethics" provisions were incongruous and discordant additions, "foreign or

irrelevant matter," unconnected in subject-matter to the "tax" provisions, and because of their incongruity, unconstitutional. We hold that they are severable from the Act, leaving the "tax" provisions fully effective.[8]

JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEES.

---

**8.** Had we any doubts about legislative intent as to severability, those doubts would be dissipated by a further reference to legislative history. When the Prince George's County Senators first called for the "ethics" amendments to HB 890, these amendments included a section 4 that would have prohibited severability. At the specific request of the County Executive, that provision was withdrawn and does not appear in Chapter 244. This indicates actual legislative intent in favor of severability. Stipulation No. 2, Joint Record Extract 438, 441–442, *Porten Sullivan* (No. 93).